RENEE, Plaintiff-Appellee, v. SANDERS, Exr. et, Defendants-Appellants.

Ohio Appeals, Eighth District, Cuyahoga County.

No. 23487. Decided January 26, 1956.

450

William J. Kraus, for plaintiff-appellee.
J. R. Kistner, A. J. Sanders, for defendants-appellants.

## OPINION

By SKEEL, J:

This appeal on questions of law is prosecuted by the defendants from a judgment entered by the Probate Court of Cuyahoga County for the plaintiff on her petition seeking a declaratory judgment as to her rights as owner of certain property held in her possession. The defendants are the executor and heirs at law of one Walter H. Knoedler, now de-

ceased, the plaintiff's claim being that just prior to his death, he made a gift to her of the property which is the subject of this action.

The plaintiff's petition alleges that Milton H. Sanders is the executor of the last will and testament of Walter Knoedler and that he, as executor, and as beneficiary and the other beneficiaries under the will of Walter H. Knoedler and next of kin of the deceased, all made defendants, claim some interest in the property. That Walter H. Knoedler on the 12th day of October 1951, made a gift to her of the property detailed in paragraphs two, three and four of her amended petition. The petition alleges that the executor and other defendants, next of kin, having the next right of inheritance, and legatees in said will, claim some interest in "said estate." The first petition was filed on the day the Probate Court appointed Milton H. Sanders executor of the estate (November 8, 1951). The property which is the subject of this action was in the plaintiff's possession at the time she filed this action and at no time prior thereto was ever under the control or in the possession of any of the defendants.

The errors claimed by the defendants are:

1. That the court was without jurisdiction to try the issues presented thereby.

2. Judgment is contrary to law.

3. Judgment is against the weight of the evidence.

4. The failure of plaintiff to rebut evidence, that is the statements of two witnesses upon issues vital to her case, required the court to accept the defendants' evidence on these questions as substantive evidence against her.

It is the conclusion of the writer of this opinion that the plaintiff's petition, when read in its most favorable light in her interest, does not present issues of fact that would give her the right to invoke the jurisdiction of the Probate Court. The other members of this Court do not concur in this conclusion.

After setting forth the property which she claims as a gift from the deceased during his lifetime, she alleges that the defendants (except the Banks), claim some interest in the property and concludes with the allegation that they also claim some interest in the estate of the deceased. Whether or not the defendants claim an interest in the estate is wholly irrelevant and the property listed is of such a character that only the executor, if it were in fact assets of the estate, would have the legal right to its immediate possession.

The jurisdiction of the Probate Court is provided for by **Sec. 8 of Art. 4 of the Constitution of Ohio**, which provides:

"The Probate Court shall have jurisdiction in probate and testamentary matters, the appointment of administrators and guardians, the settlement of the accounts of executors, administrators and guardians, and such jurisdiction in habeas corpus, the issuing of marriage licenses, and for the sale of land by executors, administrators and guardians, and such other jurisdiction, in any county, or counties, as may be provided by law."

**Sec. 2101.24 R. C.**, provides for the jurisdiction of the Probate Court and by paragraph L is authorized to entertain actions seeking declara-

tory judgments. Such jurisdiction, however, is confined to actions coming within its limited powers in supervising the administration of estates.

The Supreme Court has already considered one phase of this case, reported in **160 Oh St 279.** It was there decided that a matter coming within the jurisdiction of the Probate Court is governed by the rules of trial procedure applicable in that court and that if an action for a declaratory judgment is properly filed within its limited jurisdiction, the parties are entitled to the right to trial by jury only if the court, in the exercise of its discretion, grants such privilege. The court specifically excluded from its decision the question of whether or not the allegations of plaintiff's petition were sufficient to invoke the jurisdiction of the Probate Court. On page 281 of the opinion, the court said:

"It is to be noted that the plaintiff herself was a beneficiary under the will of the decedent to the extent of 10 per cent of the estate but the plaintiff in her petition asserts no rights because of or arising under the will."

**Sec. 2721.05 R. C.** provides:

"Any person interested as or through an executor, administrator, trustee, guardian or other fiduciary, creditor, devisee, legatee, heir, next of kin or cestui que trust in the administration of a trust or of the estate of a decedent, an infant, lunatic or insolvent, may have a declaration of rights or legal relations in respect thereto in any of the following cases:

"(A) To ascertain any class of creditors, devisees, legatees, heirs, next of kin, or others

"(B) To direct the executors, administrators, trustees or other fiduciaries to do or abstain from doing any particular act in their fiduciary capacity

"(C) To determine any question arising in the administration of the estate or trust, including questions of construction of wills and other writings."

The plaintiff claims no interest under the provisions of this section. In fact, she seeks to prevent the property described from being the subject of probate administration. It was held in the case of **Kochs, Admx. v. Kochs, 49 Oh Ap 327,** that the Declaratory Judgment Act was remedial and does not establish or change any substantive rights. Prior to the Declaratory Judgment Act, one in possession of property claimed as a gift from a decedent whose estate is about to be administered could not seek a judgment concerning the ownership of the property. Being in possession under the claim of ownership, there would be no need for judicial help. This court in the case of **Carter v. Birnbaum, 68 Abs 97,** said on **page 98:**

"If the plaintiff is successful the estate will be entirely divested of any right in the property, and on the other hand, if the defendant prevails, in this action, the plaintiff can claim no legal interest therein. This must be the result where one who does not have legal capacity to enter into a marital relation because she is then lawfully married, assumes such relation with another who, because of such supposed relationship, puts

title to his property in her name as his wife. The plaintiff does not seek an interest in property which is, or may be, in whole or in part property that is subject of administration in the estate of which the defendant is administrator. He seeks the property as his own clear of any claims of the estate of Ella Lumpkin."

and in the case of **Transport Co. v. Matyas, 159 Oh St 300**, in dealing with the jurisdiction of the common pleas court to declare the right to personal property held by an administrator, said in paragraphs one and two of the syllabus:

"1. Where a person claims the title to and the right of immediate possession of specific personal property, and that such property is being wrongfully detained from him, he has the right to recover possession of such property by an action in the Court of Common Pleas, under §12051 et seq, GC.

"2. In such a case, the person claiming to be the owner of the specific personal property may institute an action in the Court of Common Pleas for its recovery against the administrator of an estate, who is wrongfully detaining the possession of the property from such owner, where there is no question of a divided interest or ownership between such owner and the estate."

So long as plaintiff is in possession of the personal property described in her petition claiming full property rights therein, as of a date prior to the death of Walter Knoedler, there is no proceeding known to the law to give her any greater right therein until her possession or ownership is challenged. An action to fix her status with respect thereto, if allowed, as is suggested by Borchard on Declaratory Judgments, pages 6 to 11 inclusive, must relate to the date she became the owner before the death of Walter Knoedler, wherefore the Court of Common Pleas and not the Probate Court has jurisdiction of the controversy.

A procedural statute does not enlarge the jurisdiction of a court of limited jurisdiction. The Supreme Court's holding that litigants, acting within the jurisdiction of the Probate Court, are not entitled to a trial by jury as a matter of right, highlights the claim of a litigant seeking to have his rights judicially determined that his rights and those of the other parties in the action should not be forced into the jurisdiction of a court where the constitutional privileges of a jury trial are denied unless the subject of the controversy comes clearly and exclusively within the jurisdiction of such court.

The evidence in this case establishes that if in fact a gift of the property here claimed by the plaintiff was made, it was a gift causa mortis (hereafter more fully considered) and not a gift inter vivos. The plaintiff's sister testified that Walter Knoedler started to get dressed to go to the hospital at about two o'clock in the afternoon of the 12th of October, 1951. He was to leave at four. After saying he wanted to get the bill he owed for staying at the house of the witness for eight months straightened out (which he had tried to get settled on other occasions but was prevented from doing so by the plaintiff for her own purposes, his conduct on this occasion being a clear indication that he was concerned with getting his account in order before his final trip to the hospital), said:

"Peg, * * * I don't think I am coming back from the hospital again."
The witness then testified as follows:

"Q. Did you see Walter at any time again before he left for the hospital?

"A. Yes, I did.

"Q. Where did you see him?

"A. In the bedroom.

"Q. Who was with him?

"A. Mabel and I.

"Q. What, if anything, happened? What was said? What was done?

"A. Well, it was almost time for Walter to leave for the hospital, and he put on his hat and coat and he was about ready to leave for the hospital.

"Q. What, if anything, did he say or do?

"A. Well, I was brushing off his coat, and he handed Mabel a key.

"Q. What did he say?

"A. He said, 'Mabel, here is a key to my safe deposit box. I want you to have everything that is in that box.'

"Q. Did he do anything after that?

"A. Yes, he did.

"Q. What did he do?

"A. He went into his clothes closet and brought out a box.

"Q. I will hand you what has been marked for identification as Plaintiff's Exhibit 13. Is this the box?

"A. Yes.

"Q. That he took out?

"A. Yes. That is the box.

"Q. What, if anything, did he do with the box, and what did he say?

"A. He handed the box to Mabel and he says, 'Mabel, this is yours. I want you to have everything that is in it, and everything in it belongs to you.'

"Q. What, if anything, did Mabel do?

"A. Mabel took the box, she put it on the desk, and started crying.

"Q. What did you do?

"A. Well, I started crying also and I left the room.

"Q. By the way, what did Mabel do with this key to the safe deposit box?

"A. I don't know where the key is. I don't know.

"Q. Did she take it from Walter when he handed it to her?

"A. Yes, she took the key.

"Q. Did Walter go to the hospital?

"A. Yes. Walter left for the hospital."

This is all there is in the record dealing with the making of the alleged gift and the circumstances under which it is claimed to have been made. Walter Knoedler was in the act of leaving for the hospital. He said he did not expect to return. He was a very sick man. Can it be claimed with these facts in mind that if in fact a gift was made, that it was not made in contemplation of death? Can it be said that the donor was disposing of one-third of his estate of over $150,000, the prop-

erty claimed being all of the money and liquid assets he owned, as a gift to the plaintiff, a paid employee, to be absolute even if he were to survive the peril of death? We think not.

The plaintiff was unquestionably a trusted confidant of the decedent. She called many witnesses to establish her close and confidential relationship with him during the last ten years of his life. The plaintiff worked for the decedent in the conduct of his "Men's Shop" for a number of years and gradually assumed authority in its operation until he went to the hospital for the first time in October, 1950, when she was left in full charge. She had access to all of his valuable papers, took care of his banking and in every way acted with regard to his business and personal affairs in his stead from that time until the business was sold January 1, 1951.

After January 1st, 1951, the plaintiff testified that she spent all her time taking care of the decedent. She continued as before to maintain her residence at 2026 East 107th Street, although staying with Walter for which she received for her services at least $250.00 per month. She also took out of his accounts other sums (in excess of $5,000.00) most of which was deposited to her personal account and some of which was used to pay medical and doctor expense. She did not pay his room rent at her sister's home during the eight months he lived there, as above suggested, although a claim was filed for such living expense immediately after his death, such claim being discussed with Sanders even before he was appointed executor. At one period prior to 1950, Walter asked the plaintiff to marry him which request was refused but she continued to live in relation to him in a close and confidential way.

Walter Knoedler was described by his employees, business associates and friends alike, as a man not given much to sentiment or unusual generosity, somewhat stubborn, demanding fairly but firmly exactitude in the conduct of his employees, with reasonable friendliness to those about him.

The plaintiff arranged with her sister, Peg Wilkinson, after he left Grace Hospital, to let Walter Knoedler come to live at her residence at 2501 Euclid Heights Boulevard where he continued to reside until two weeks before his death, when he was moved to Doctors Hospital. He had an apartment at that time at 1930 East 85th Street. Sometime after January 1st, 1951, Mabel Renee changed Walter's address on his commercial banking account and with some of the companies in which he was a stockholder so that dividend checks and bank statements would be addressed to her residence at 2026 East 107th Street. Before leaving Grace Hospital, the decedent, by codicil dated December 5th, 1950, added to the provisions of his will by providing that Mabel Renee should receive ten per cent of his estate because of kindness and service to him and a like provision was included in the codicil of five per cent of his estate to Milton H. Sanders, his lawyer, for like reasons. The total estate of Walter Knoedler, including the property involved in this lawsuit, was about $150,000. There is no evidence that Mabel Renee was ever informed of the codicil.

The operation to which the decedent was subjected at Grace Hospital

was in medical terms a "Colostomy." The patient was taken to surgery on three occasions and was in the hospital from October to February. One witness, who knew Walter through Mabel Renee, a registered nurse, having taken a post-graduate course in surgery at the Cleveland Clinic, and who had fourteen years experience as a nurse, gave some assistance to Mabel in the care of Mr. Knoedler. She testified as follows as to one occasion when she was giving help:

"A. I saw him two weeks before he went to Doctors Hospital.

"Q. What did you observe about him?

"A. Well, that he was a very sick man, too sick, I felt, for Mabel to try to take care of at home. However, I helped her and taught her to give him an enema which gave him a lot of relief and his pain was localized more in the lower bowel and she also gave him hot compresses which relieved him."

This witness also testified that Walter wanted her to help teach Mabel to drive, that he had registered her for that purpose at the auto club but she had been unable to take her lessons regularly.

Walter Knoedler died about 2:00 P. M., October 24th, 1951. The plaintiff was notified at about that time and testified that she went at once to the hospital and stayed there until the body was removed to Salem, Ohio. She then testified that she went to her sister's home from the hospital and directly and categorically denies that on that afternoon she was at any time at or in the office of The Cleveland Trust Company at East 105th Street and Euclid Avenue.

The plaintiff drove with Walter's brother's widow from Cleveland to Salem, Ohio, to attend the funeral, the trip being made on Friday evening October 26th. The funeral was held Saturday, October 27th in the afternoon. After the funeral, the plaintiff testified that a wife of one of the nephews came to tell her, after a reading of the will that she was to receive ten percent of the property. She testified she was not interested and that she did not talk to or see the nephew. She also testified that she did not disclose to her hostess or to the nephew's wife that she had received a gift of the property she now claims by this proceeding.

The plaintiff returned to Cleveland on Saturday evening, October 27th, and on Sunday evening, opened the green safety box left in Walter's room and in the presence of her sister, started to make a list of the "stuff" but did not finish, returned the documents to the box and put it in the dresser.

On Tuesday afternoon, October 30th, Mr. Milton H. Sanders, defendant herein, who was subsequently appointed executor of the estate as directed by the will, with one of his office associates, called at 2501 Euclid Heights Boulevard and asked to list "Walter's property." There is some evidence in the record that this trip was suggested by Mrs. Wilkinson to talk over her claim for Walter's keep. The plaintiff took them to "Walter's room," unlocked the box, and at least a partial list of his property was made. They also called the next day to finish the work but she refused to let them proceed with the listing of the property. It was at this meeting that she told Mr. Sanders he would have to talk

with her lawyer, Clarence Snyder. At no time on either of these days, by her own testimony, did she disclose that she claimed a gift of the property in the box or in the safety box at the Bank. The plaintiff's testimony and her actions and disclosures on this subject after the death of Walter Knoedler was equivocal, indecisive, lacking in forthrightness and in many instances contradictory.

The defendants' evidence was introduced tending to establish the following facts: That on the day the plaintiff checked the decedent into Doctors Hospital, she specifically directed that Walter Knoedler was not to have visitors, particularly lawyers. This fact as to plaintiff's conduct was testified to by the Admitting Officer at the Hospital who made the notation "no visitors" on the admission record, the receptionist and one of the nurses. The record shows that the doctor in charge of the case made no such request and said that the patient could have visitors. The evidence also shows that a lawyer was permitted to visit the patient and after he left Mabel Renee complained bitterly about it and said she did not want his lawyer up there. That while Mabel Renee was in Salem, both Leland Knoedler and his wife (after the funeral and the reading of the will), visited her at the residence where she was staying to tell her of the interest in the estate given her by the will at which time she became emotionally angry. She is alleged to have said:

"I don't see how they could do these things so soon."

and

"She knew what Walter wanted. She could tell us things that would make her hair curl."

She is also said to have spoken in a very derogatory way about Mr. Sanders and that he had sold the store right from under her nose. The evidence about this interview placed both Leland Knoedler and his wife as participants in the conversation rather than just the wife as testified to by the plaintiff.

A bank teller from The Cleveland Trust Company testified that Mabel Renee came into the Bank to make a deposit for Walter Knoedler at or after closing hours, that is, about 2:30 P. M. on the afternoon of October 24th. This was the day Walter Knoedler died, his death occurring at or before 2:00 P. M. The deposit slip which he made out for her was for $514.01 consisting of eight checks, one of which was a bonus check to the decedent for $322.39, dated September 12th, from Adams Hat Stores, Inc. This check had been delivered to Walter Knoedler by Wilber Stiel who had purchased one-half of Walter Knoedler's business and who was in complete charge of the store when the check was received at the "Men's Shop." He said that when he gave the check to Walter shortly after September 12th, he claimed that it was not the right amount and refused to cash it. The deposit was to Walter Knoedler's commercial account. This account was listed as one of the gift items in the amended petition, so that if the plaintiff made such deposit after Walter's death, her purpose must have been to increase the amount of the claimed gift. Being deposited after banking hours, it shows on Walter Knoedler's bank statement as of October 25th, the day after his death, but the testimony of the bank teller with the bank

records, challenges completely the plaintiff's testimony that she was not at the bank on the afternoon of Walter Knoedler's death when the deposit was made. The checks which made up the deposit must have been taken from Walter's room at 2501 Euclid Heights Boulevard, the same address where the green safety box was kept and one of the checks, dated September 28, 1951, was addressed to Walter Knoedler at plaintiff's address 2026 East 107th Street.

The two lawyers testified to the fact of having called at the Wilkinson residence at 2501 Euclid Heights Boulevard on the 30th of October to make a list of Walter Knoedler's property found in his room after his death—John J. Fuerst, Jr. and his then employer, Milton H. Sanders, who had been named as executor in Walter Knoedler's will. They both testified that the plaintiff got the key for the box, which was among a bunch of keys taken out of a man's suit in Walter's closet, opened the box and in a friendly way helped to list Walter's property. Fuerst made a list as Sanders called out the items taken from the box by the plaintiff. The plaintiff made no claim of ownership of any of the property listed except the automobile which she said Walter gave her, but when she was shown that the title certificate had not been indorsed, she suggested that she might buy it if it was for sale.

The next day when there was an attempt to complete the listing of Walter's property, she refused to let them proceed, referred them to her lawyer, but even then did not make a direct claim of ownership of the property or disclose that she claimed it as a gift. This testimony also shows that her lawyer, who was contacted, made no claim of gift for his client. On this occasion, Fuerst testified as follows:

"A. And then became very emotionally upset, and said: 'My God, Walter's nephews won't get any of this property if I can help it.'

"And she said: 'I have got some bonds and other things that you or nobody else is going to find out about.'

"Then it was a very—she was very emotional and upset."

It will be remembered that Wilbur Stiel, the purchaser of a one-half interest in the "Men's Shop" testified that in September, 1953, he found two $1,000.00 bonds belonging to Walter Knoedler.

"Mixed up in some of the property and things in the basement."

At the conclusion of defendants' case, the plaintiff rested her case without taking the stand to rebut or attempt to explain any of the evidence which challenged her veracity and her attempt to establish a gift nor was her lawyer called. The defendants' evidence on these subjects, introducing new factual matters such as the testimony that the plaintiff claimed a gift of the automobile without mentioning the other property which she helped to list as "Walter's property," now stands unchallenged on the face of the record.

In this case where the degree of proof required of the plaintiff is by clear and convincing evidence and the facts of the gifts are supported by the testimony of but a single witness closely related to the donee and when the plausibility of the plaintiff's claim is strongly challenged by the testimony of reputable lawyers (who are officers of the court) and the testimony of others of unchallenged veracity with respect to facts that,

if true, clearly establish that the plaintiff's conduct was most unusual under the circumstances in failing to claim ownership of the property by gift on the many occasions when she had the opportunity to speak, and where such evidence tends to establish that her actions did not square with what would naturally be expected of one claiming the ownership of a large amount of property as a gift, the failure to rebut such evidence casts grave doubt as to the positive value of the plaintiff's evidence introduced to make out her case. From an examination of all of the evidence, we hold that the plaintiff did not sustain the allegations of her petition by the proper degree of proof and that the judgment is against the manifest weight of the evidence.

There are other questions presented by the record challenging essential elements of proof in plaintiff's case. The only proof of what was in the box as of the date of the gift was as to its contents eighteen days later. During this period (from Oct. 12th to Oct. 30th, 1951) the donor was in the hospital until his death on October 24th and the box was in his room at 2501 Euclid Heights Boulevard, to which the plaintiff had access at all times. That she had access to the box even before October 12th is established by her own testimony. When being cross-examined about what she did with the box and its contents on the Sunday evening after the funeral, she testified:

"Q. Do you know without refreshing your recollection what was the first thing you saw when you opened the box? What was on top?

"A. Well, naturally, the first thing that was on top was bonds.

"Q. Bonds?

"A. Yes, sir, because I put them there."

There is no principle of law which supports the claim that a status shown to exist on a particular date operates restrospectively to establish that such status existed on a time prior thereto. As to the circumstances of this case, no such presumption could be indulged in prospectively. The box, claimed to be in the possession of the plaintiff, could have been filled and emptied every day. The contents of a box is not such a static thing as to invoke the presumption that once its status is established, it is presumed to continue until change is shown nor could such presumption apply retrospectively. In Jones on Evidence (2d Ed.), Volume 1, page 440:

"It is at once evident that the presumption can have no application except to those conditions which, from their nature, must continue for some appreciable length of time. One court has brought out this feature of the presumption by tersely remarking 'It is a general rule that a condition shown to exist is presumed to continue until negatived, but this rule applies only to permanent and continuing conditions * * *.' "

The author further says on page 440:

"The presumption cannot be reversed. There is no presumption from the fact that a condition exists at a particular time that it existed in the past." (See citation of authorities under note 19; see also Principles of Judicial Proof by Wigmore.)

The failure of direct proof of the contents of the "Box," or the subject of the gift, at the time of the gift causa mortis was claimed to have been made is fatal. A death-bed donation made in the shadow of the

grave disposing of one-third of a large estate by one who has previously made a will and within a year of his death amended his will by the execution of a codicil which was witnessed as provided by law by which this plaintiff was remembered to the extent of one-tenth of the estate and who as a responsible business man and who by his experiences was fully cognizant of the formality necessary to dispose of property after death, where under such a background a gift is claimed, witnessed by a single person by chance, constitutes one of the basic reasons for strict proof of such a claim. Here, where only one member of the household other than the donee claims to have been present at the making of the gift just as the donor is leaving for the hospital, never to return, and where at least one other member of the household with whom he was sufficiently close to kiss good-bye upon leaving for the hospital, was within the call of his voice, the circumstances as provided by the great weight of authority call for clear proof of all the elements of such gift.

The elements of a gift causa mortis are not greatly different from those of a gift inter vivos but some distinction is to be found from the cases. A gift causa mortis is one made in contemplation of death from a peril then confronting the donor and is revoked if the donor survives the peril from which death was anticipated. Could it be doubted in this case that had Knoedler survived the illness for which he was hospitalized and had returned to his residence, that the ownership of the subject of the alleged gift, constituting all of his liquid assets, would have been in him instead of Mabel Renee?

It is also true that the proof of delivery and surrender of dominion over the subject of a gift causa mortis requires a clear and convincing showing that all vestige of control has been surrendered to the donee, putting the property beyond any control by the donor. In a gift inter vivos, the donor is available as a witness should such gift be challenged while in a gift causa mortis, when it becomes absolute, the donor's lips are sealed by death. Property found in the donor's box or receptacle or in his living quarters after death is strong evidence that if a gift was intended, it has been completely revoked or was not in fact completed for want of sufficient delivery.

In the case of Parker v. Copland, 70 N. J. Eq. 685, 64 Atl. 129, the plaintiff, at the request of the deceased, took a tin box from its place in donor's closet and handed it to him. The deceased took some bank books out of the box and presented them to the plaintiff as a gift. Thereafter the plaintiff returned the subject of the gift to the box, put the box in the closet from which it had been taken, locked the closet door and put the key back in the deceased's dresser. It was held that a gift was not accomplished for want of surrender of dominion over the property by the deceased donor.

The facts here claimed by the plaintiff are that the decedent took the box out of the closet, handed it to her with the key and the key to his safe deposit box in the bank and said: "I want you (the plaintiff) to have everything in this box" and that in the safe deposit box in the bank. The box was still in the deceased's room at the time of his death and while the plaintiff had some of her things in the same room, and

claimed to have been staying there, her reason for being there was to render care to the deceased, but her residence during that time was 2026 East 107th Street where she returned after Walter's death. The securities and bank books, representing over $50,000.00, where in the same green box and in his room upon Walter's death, the box admittedly being the property of the deceased, it being turned over to the executor. together with some jewelry that was in the box, by the plaintiff a few days after the list of its contents was made out on the 30th of October with no claim or right asserted either to the box or the jewelry found therein. Under the facts, the donee's possession of the subject of the gift was not sufficiently exclusive and the donor's dominion over the property not in fact so completely surrendered as to make out a gift causa mortis under all the surrounding facts and circumstances, such circumstances challenging the gift being strongly supported by the unrebutted testimony of Fuerst and Sanders that when they went to Walter's room on the 30th to list "Walter's property" with the willing assistance of the plaintiff, the box was in his closet and the key, which was said to be one of a bunch of keys, was taken from a man's suit hanging in his closet.

Chief Justice Vanderbilt of the Supreme Court of New Jersey, in the case of Foster v. Reiss, 18 N. J. 41, 112 A (2d) 553, considered fully the history of gifts causa mortis. The court held that such gifts are an invasion of the province of the Statute of Wills and are not favored. To constitute a gift causa mortis, actual, unequivocal and complete delivery during donor's lifetime, wholly divesting him of possession, dominion and control, is required and this can be satisfied only by delivery by the donor through an affirmative act and not by mere taking possession by the donee.

It is generally held that even though words of gift are spoken, if the property remains in the donor's room and with his effects so that no apparent change was made in the possession or control of the property, it being unlikely that the parties would intend to make a bailee out of one who is facing dissolution, that a sufficient delivery cannot thus be made out to support a gift causa mortis. McGrath v. Ringold, 116 Mass. 566.

Delivery as well as intent to give are absolutely essential. In commenting on the case of Parker v. Copland, supra, in 20 Harvard Law Review, 151, it is said:

"In the case at hand, there had, indeed, been a manual delivery of the gift, but since it was immediately restored to its former position, it cannot be said to have been placed beyond the control of the donor. Further the facts of the gift here must needs be shown by evidence rather than by possession, which is the very thing that the rule as to delivery is designed to avoid. The decision seems eminently sensible and the few cases in point are in accord. Bunn v. Markham, 7 Taunt 223. Dunbar v. Dunbar. 80 Maine 152, 13 Atl. 573."

We hold, therefore, that the judgment of the Probate Court is not supported by the proper degree of proof and for that reason such judgment is reversed and cause remanded for further proceedings according to law.

KOVACHY, PJ, concurs in part and dissents in part.
HURD, J, dissents.

## CONCURRING AND DISSENTING OPINION
By KOVACHY, PJ.

I concur with the conclusion "That the judgment of the Probate Court is not supported by the proper degree of proof and for that reason such judgment is reversed and cause remanded for further proceedings according to law," but disagree with the conclusion "That the Probate Court should have granted defendants' motion to dismiss for want of jurisdiction."

The motion of the defendants to dismiss the amended petition was only filed after the amended petition and the answer of all the defendants had been filed and the case appealed to the Court of Appeals and to the Supreme Court of Ohio on the ground that a demand for a jury trial filed by the defendants had been erroneously stricken from the files by the Probate Court. The Supreme Court, in that appeal, **Renee v. Sanders, Executor et al, 160 Oh St 279,** said on page 285:

"It is to be noted that in the instant case the jurisdiction of the Probate Court was not challenged."
and page 286:

"The question of jurisdiction was not before the Court of Appeals and is not before this Court. For the purpose of this case, the Court must assume but does not decide that the action was properly brought in the Probate Court."

Even though the question of jurisdiction was not squarely before the Supreme Court in that appeal, the majority of this Court feels that that high tribunal would not have taken the great pains that it took therein to write a carefully considered opinion and remand the cause for trial to the Probate Court if it had any serious doubt as to the jurisdiction of that Court to hear the matter.

The amended petition, inter alia, alleges that Milton H. Sanders is the executor of the last will and testament of Walter H. Knoedler, now deceased; that Walter H. Knoedler, during his lifetime made a gift to plaintiff of specified funds in bank accounts, specified securities, and the contents of a safety deposit box; and that Milton H. Sanders, as executor of the last will and testament of Walter H. Knoedler, made a demand upon plaintiff for the possession of those items, claiming an interest in the same. The prayer is that the Court render a declaratory judgment as to the right of the parties defendant and the plaintiff to such assets and "that the court may make such other rulings as may come before it in the trial of this matter or that may be beneficial, pertinent or useful in the administration of the decedent's estate."

The answer of Milton H. Sanders, executor of the estate of Walter H. Knoedler, deceased, admits in his answer that "said next of kin, **plaintiff,** and Milton H. Sanders are named as legatees in the last will and testament and claim an interest in such estate." (Emphasis ours.)

The defendants-appellants do not question the power of the Probate Court to entertain an action for a declaratory judgment nor do they contend that a proper cause of action for adjudication in a declaratory judgment suit is not stated in the amended petition. They merely urge that, since the Probate Court is a Court of limited jurisdiction, it lacks

the power to determine the title to personal property claimed to have been given the plaintiff-appellee by the decedent during his lifetime and now demanded by the executor of the estate as assets of it, and that as a consequence does not have jurisdiction over the subject matter of the action.

The plaintiff-appellee maintains that the Probate Court has jurisdiction of the subject matter of this declaratory judgment action and relies, in the main, for her position in the matter on the case of **In Re Estate of Morrison, 159 Oh St 285, 112 N. E. 2nd 13.**

There is no doubt but that the executor under §2109.50 et seq R. C. (§10506-67 GC et seq.), would have had the right to present a claim in Probate Court to determine the title to the disputed personal property. **18 O. Jur., Executors and Administrators, 576, Sec. 467,** reads as follows on this subject:

"* * * proceedings under §10506-67 et seq, GC, constitute a trial of the right of property, and in consequence a judgment pursuant to these provisions of statute may be pleaded in bar of another action to try title to or the right of possession of the property involved."
and page 577:

"The former statute (§10678 GC now repealed) gave no authority to hear and determine questions of title. Under the Probate Code, however, the court has authority to cite all persons who claim any interest in the assets alleged to have been concealed, embezzled, conveyed away, or held in possession, and also authority to hear and determine questions of title relating thereto."

Sec. 2109.52 R. C. (§10506-73 GC).

See **Brown v. S. O. Sav. Bk & T. Co., 22 Oh Ap 324, syllabus 2** and **Losee, Admr. v. Krieger, Admr., 22 Oh Ap 395, syllabus 1 and 3.**

That the executor in this case would have instituted such an action in Probate Court, if this declaratory judgment lawsuit had not been filed by Mabel Renee, can hardly be doubted in view of his personal connection with the affairs of Walter H. Knoedler over many years before his death and his conduct toward Mabel Renee with respect to this personal property in her possession since his death. The Declaratory Judgment Act provides a ready means to have one's "rights, status and other legal relations" declared whether or not further relief is or could be claimed. **Sec. 2721.03 R. C. (§12102-2 GC).** It would indeed be a strange anomaly of Probate Law if the executor of an estate can invoke accusatory proceedings against one for withholding assets of an estate in Probate Court but the one about to be so accused is barred from bringing an action in the same court to have his rights, status and other legal relations declared with respect to the same subject matter and involving the same questions of law when that court is expressly empowered by law to entertain declaratory judgment actions.

The estate of Walter H. Knoedler was properly before the Probate Court for administration and settlement. The plaintiff was interested in the due administration of that estate as a legatee. She was also interested in knowing whether Milton H. Sanders, the executor of the estate, had the right to demand that she turn over to him the possession

of certain personal property which she claimed as a gift inter vivos by the decedent before his death. The personal property, if a part of the estate, would constitute a substantial part of it. The expeditious and orderly administration of an estate in the very bosom of the Probate Court was thus involved. Can it successfully be maintained, then, that Probate Court lacks the power and jurisdiction, in a declaratory judgment action, to adjudicate the title to personal property that is in the possession of a person under the claim of a gift inter vivos during the life of a decedent and, at the same time, is demanded by the executor as an asset of an estate under the administration and settlement of that court? We feel not and believe that the provisions of the Constitution, the statutes dealing with the jurisdiction of Probate Courts, and the case law of Ohio support such conclusion.

**Article IV, Sec. 8 of the Constitution of Ohio,** provides:

"The Probate Court shall have jurisdiction in probate and testamentary matters, the appointment of administrators and guardians, the settlement of the accounts of executors, administrators and guardians, and such jurisdiction in habeas corpus, the issuing of marriage licenses, and for the sale of land by executors, administrators and guardians, and such other jurisdiction, in any county, or counties, as may be provided by law."

**Sec. 2101.24 R. C.** (§10501-53 GC) recites that the Probate Court shall have jurisdiction—

(D) to direct and control the conduct and settle the accounts of executors and administrators and order the distribution of estates:

"* * *

"(M) To direct and control the conduct of fiduciaries and settle their accounts."

Such section provides further that "the Probate Court shall have plenary power at law and in equity fully to dispose of any matter properly before the court, unless the power is expressly otherwise limited or denied by statute."

Moreover, §2721 **R. C.** (§12102-1 GC), a part of the Declaratory Judgments Act, reads:

"Courts of record shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed. * * *"

**Sec. 12102-1 GC,** at the time this cause arose and the action was commenced read:

"Courts of record within their respective jurisdictions shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed. * * *"

And §2721.05 **R. C.** (§12102-4 GC), states:

"Any person interested as or through an executor, administrator, trustee, guardian or other fiduciary, creditor, devisee, legatee, heir, next of kin, or cestui que trust, in the administration of a trust, or of the estate of a decedent, an infant, lunatic, or insolvent, may have a declaration of rights or legal relations in respect thereto in any of the following cases:

"* * *

"(C) To determine any question arising in the administration of the estate or trust * * *"

The Supreme Court of Ohio in the case of **In Re Estate of Morrison, 159 Oh St 285,** stated in the syllabus:

"By the Constitution and statutory enactments, the Probate Court is invested with the power and jurisdiction to adjudicate a matter relating to the title to and status of personal property, where, during the administration of a decedent's estate in such court, decedent's widow files her petition asking for a declaration that certain personal property is an asset of the estate and must be administered as such, as against the claim that such property was effectually disposed of by the decedent during his lifetime through a written declaration of trust."

We believe the instant case analogous to that case. There, the widow of the decedent brought the action, here a legatee. In each the claim was made in declaratory judgment proceedings that personal property had been effectually disposed of by the decedent during his lifetime —"by a written declaration of trust" in the Morrison case and by gift inter vivos in this case. This case, moreover, has the added feature of a demand by the executor that the personal property be turned over to him as assets of the estate. In our opinion the principle of law enunciated in the Morrison case, supra, is applicable to the facts in this case.

We, accordingly, conclude that the motion to dismiss the amended petition in the Probate Court for want of jurisdiction was properly overruled by that court.

Exceptions. Order see journal.

HURD, J, concurs.
SKEEL, J, dissents.

## DISSENTING OPINION

By HURD, J.

The judgment of the Probate Court should be affirmed because:

1) There are no errors of law prejudicial to the rights of the appellant and

2) The judgment is not contrary to the manifest weight of the evidence but is sufficient in quantum and quality to meet the test of clear and convincing evidence as set forth in the opinion of the Probate Judge.

This is the third time that some branch of this litigation, which began in 1951, has been before this Court for review, once on appeal from the Court of Common Pleas and now for the second time, upon appeal from Probate Court. The previous appeals were on questions more or less technical in nature and now, when for the first time, we have a judgment on the merits, a reversal is to be entered on the weight of the evidence. Such a reversal is entirely unjustified by the evidence in this record.

A reading of the record discloses that the Probate Judge presided at the trial with commendable fairness and impartiality during the latter part of October and first part of November, 1954, and after due deliberation, entered judgment for the plaintiff, accompanied by an opinion, filed January 6, 1955, setting forth cogent reasons for his decision,

This appeal is on questions of law only, consequently, we do not have the case for review as in chancery, for trial "de novo." Therefore, this Court is not free to analyze the evidence in such a manner as to substitute its judgment for that of the Probate Judge who tried the case.

This proposition is well stated in 3 O. Jur. 2nd 807, "Appellate Review," Sec. 818, as follows:

"The weight to be given to the conclusions of the triers of the facts and of the trial court passing upon motion for new trial is coupled with the usual presumption which must be indulged in favor of the correctness of the judgment and proceedings under review, and in determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts; if the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."

The Probate Judge, having heard the testimony of the witnesses at first hand, and having seen and considered their manner, demeanor and appearance on the witness stand, their intelligence or lack of intelligence, their powers of memory, the consistency of their testimony with other known facts, their candor or want of candor, their interest in the cause and the weight or value to be given to their testimony, was in a much better position to consider these factors then this reviewing court which has before it only the cold print of the record. This proposition is well stated also in 3 O. Jur., 2nd, 808, Sec. 818, page 634, as follows:

"One of the basic reasons underlying the principles relating to review on the weight of the evidence is the great advantage possessed by the jury and the trial court in judging the accuracy, candor, and credibility of witnesses and the weight to be given their testimony, from the fact that they see the witnesses testifying and hear what they say at first hand with full opportunity to observe their appearance, conduct, demeanor, the inflections of the voice, accompanying gestures, etc., while the reviewing court has before it only the written record of what was said."

The record herein contains the testimony of fifteen witnesses in favor of the plaintiff which, in a substantial manner, tends overwhelmingly to support the conclusions of the Probate Judge as set forth in his opinion at page 10 as follows:

"From the foregoing, it is the opinion of the Court that the requisites of a valid gift inter vivos were met, that Walter intended to make an immediate gift to Mabel and that he did make a gift with the relinquishment of all his dominion and control over the key to the safety deposit box in the bank and to the metal box (Plaintiff's Exhibit 13) and the contents thereof, insofar as the contents of the metal box could be the subject matter of a gift."

The fourteenth witness to take the stand in favor of the plaintiff was one, Peg Wilkinson, the sister of the plaintiff. Her testimony may

be regarded as the key testimony as the plaintiff was not permitted to testify to events preceeding the death of the donor by reason of the provisions of §2317.83 R. C. The testimony of Peg Wilkinson stands uncontroverted and uncontradicted in the record. With her testimony, all the essentials of a valid gift inter vivos or causa mortis were demonstrated beyond any question of doubt. The trial judge believed in the truth of her testimony as he had a right to do and able counsel for the defendant did not attempt to cross-examine her with respect to the gift.

However, in addition to her testimony, the record discloses the testimony of thirteen other witnesses (exclusive of the plaintiff) which quite definitely and logically supports the conclusion of the Probate Judge that the decedent intended to and actually did make a gift to the plaintiff of the personal property in question and that he had every good reason to regard the plaintiff as one of the natural objects of his bounty. The evidence in this respect, when considered together with the evidence of the key witness, certainly was most clear and convincing. Reason dictates that one who has been the recipient of loyal, devoted service, during many years, and particularly during times of stress and trouble, including a long and lingering last illness, is naturally inclined to appreciate such devotion and service and is bound in nature, to exemplify that appreciation in some substantial manner within his means.

The evidence here shows approximately sixteen years of dedicated service by the plaintiff to the decedent in such a manner as to help him build up his business and then to carry it on successfully for a period of time during his illness, and finally, to spend twenty-four hours a day in nursing services during approximately the last eight months of his illness. The evidence further indicates that the gift to the plaintiff was approximately one-third of his estate, leaving a balance of approximately $100,000.00 to his next of kin. On the other hand, the record shows, according to the testimony of witnesses, whom the trial court evidently deemed worthy of belief, that his next of kin manifested very little interest in him or his welfare during his lifetime but became intensely interested in his estate upon his decease.

It is claimed that the failure of the plaintiff to take the stand in rebuttal of testimony given by Attorneys J. J. Fuerst, Jr. and M. H. Sanders, concerning the events of October 30, 1951, required the trial court to accept their testimony as substantive evidence against the plaintiff. This contention is not sound because it does not in any way contravert or contradict the positive evidence adduced by plaintiff. This testimony refers to incidents occurring at the home of Peg Wilkinson on Euclid Heights Boulevard when Mr. Sanders, accompanied by Mr. Fuerst, came to make a list of the property held by the plaintiff, the subject of the gift in question. I have no doubt that the attorneys told the truth about what occurred upon that occasion. The testimony of the attorneys is generally to the effect that when they came there on the first day, the plaintiff did not assert her claim to the property as a gift except as to the automobile, and that it was not until the second day, on the advice of counsel, that she declined to proceed further with the listing of the property. Consequently, there was no issue of veracity drawn between the plaintiff and these witnesses. The plaintiff is a lay-

man, not skilled in the law, and there was no good reason why she should confide in the attorneys for the defendant as they were obviously not acting in her interests or representing her in any manner whatsoever. In addition to this, the record shows clearly that she was low physically and mentally, suffering from nervous shock and physical exhaustion due to her unremitting labors in continuous attendance upon the deceased during his last illness, furnishing sufficient reason, if any were needed, not to be so alert to her own interests as to assert her rights immediately in the presence of these witnesses. Consequently, there was no reason why she should take the stand in rebuttal of their testimony which must be considered as true but which was, at best, only collateral, indirect and inferential, having little or no probative value as bearing upon the principal issue. This testimony presented by them was negative in character as against overwhelming positive testimony establishing the gift. Furthermore, the trial judge heard all of this evidence, and was entitled to draw his own conclusions therefrom.

In the instant case, the gift of the personal property was made in the presence of plaintiff's sister, together with the keys, both of which she then and there accepted. The decedent never returned from the hospital. The fact that she placed the box with the securities back in the same room does not negate the gift or the completion of the gift because at the time, the plaintiff's occupancy of the room in her sister's house was as complete as the decedent's Under the circumstances, the decedent, leaving for the hospital from which he never returned, the transaction was such that "in conformance with the donative intention," he completely stripped himself of dominion of the thing given.

The majority opinion raises an issue not presented by the briefs and cites in support thereof the case of Parker v. Copland, decided in 1906, 70 N. J. Eq. Rep. 685, wherein the decree advised by the Vice Chancellor was against a claim "to an entire estate by the production of a bare preponderance of parol proof." The facts in that case are not analogous to the facts in the instant case. Furthermore, in that case, the trier of the facts advised against allowance of the gift and his advice was followed by the court. In the instant case, the trier of the facts found in favor of the gift, which finding should be sustained by this Court. A reading of the case discloses many other factual differences whereby the New Jersey Case must be distinguished from the instant case.

Facts and circumstances bearing upon gifts, both inter vivos and causa mortis, vary considerable as shown by the many cases on the subject. Cases having some reasonable analogy to the instant case may be cited as follows:

**Bolles v. Trust Co., 132 Oh St 21; Bolen v. Humes, 94 Oh Ap 1;** Matter of Swade, 65 N. Y. App. Div. 592.

In conclusion, I wish only to state that I concur with the opinion of Kovachy, P J., wherein he holds that Probate Court had jurisdiction to entertain and determine this cause.

For the foregoing reasons and for the reasons set forth in the opinion of the Probate Judge, I believe the judgment of Probate Court should be affirmed.