*23
 
 Zimmerman, J.
 

 Opposing counsel agree that the important question in this controversy is whether there was a valid and completed gift
 
 inter vivos
 
 of the designated securities from George A. Bolles to Clara C. Bolles, and have made their arguments accordingly.
 

 It appears from the record that George A. Bolles and Clara C. Bolles were married in the summer of 1920. She was the widow of Harrison W. Blevins and had two'minor children, Robert and Carolyn Blevins, who were legally adopted by Mr. Bolles in the fall of 1920. In August of 1921 Mr. and Mrs. Bolles became the parents of a daughter who was named Barbara Ruth Bolles, and this completed the family.
 

 Mr. and Mrs. Bolles lived together in a seemingly harmonious relationship until his death. Her former husband, Harrison W. Blevins, had been the owner of one-half of the capital stock of The Blevins Realty Company, Incorporated, which came into her possession and control after his death. In 1921 Mr. Bolles acquired the remaining half of this stock by purchase. Sufficient stock was transferred to other individuals to constitute a legal board of directors.
 

 During the year 1927, by authority of a resolution of the board of directors of The Blevins Realty Company, a safety deposit box was rented, in the name of the company, in the Ohio Trust Company of Toledo, to which both Mr. and Mrs. Bolles had access, possessing separate keys.
 

 Later on, in 1931, a safety deposit box was rented under the same conditions in The Toledo Trust Company, being the box in which we are presently interested. In it were kept securities Mr. Bolles had purchased with his own funds. When the box was opened after his death such securities were found in a folder, on the outside of which was inscribed'the name or initials of George A. Bolles. They all stood in his name, were unassigned and unendorsed, and bore dates
 
 *24
 
 of issuance from May 7, 1929, to December 27, 1932, excepting the certificates of stock of The Blevins Realty Company which had been acquired in June of 1921. In another and separate folder in the same box were other securities, indisputably the property of Mrs. Bolles or of the Harrison W. Blevins estate. Some of these were represented by certificates of stock which Mr. Bolles had bought for his wife and which had been issued in her name.
 

 According to the records of The Toledo Trust Company, Mr. Bolles visited the safety deposit box described on some forty-eight or forty-nine occasions between the time of its rental in December of '1931 and July 28, 1933. According to the same records Mrs. Bolles visited the box some three times between the date of its rental and Mr. Bolles’ death. No direct evidence was produced that they were ever there together, and it would seem certain that neither Mr. nor Mrs. Bolles made use of any other safety deposit box.
 

 Mr. Bolles kept a book account of his investments, and the receipt of dividends and interest from the securities mentioned was included therein. He collected such returns and deposited them to his individual account in The Toledo Trust Company. The record is silent as to whether he listed them in his income tax returns to the federal government, but Mrs. Bolles did not in hers, covering the calendar years of 1932 and 1933.
 

 So far as the record discloses, Mrs. Bolles had the securities in her hands but twice during the lifetime of Ceorge A. Bolles. The first time was in November of 1932 when she went to the box alone and made a list of its contents, denoting some of the securities “good” and others “doubtful.” The other time was in July of 1933 when she and her daughter, Carolyn,
 
 *25
 
 went to the box at the direction of Mr. Bolles to look for some guardianship papers relating to Carolyn.
 

 William Bolles, a brother of George A. Bolles, was indebted to The Toledo Trust Company on a loan of money. Additional collateral was demanded and George A. Bolles furnished the same from the securities in the safety deposit box referred to, accepting a receipt from the bank reading as follows:
 

 “The Toledo Trust Company
 

 “Toledo, Ohio, June 28, 1933.
 

 “Received from George A. Bolles 600 shares Libbey Owens Ford Glass Co., common stock to be held by ns as collateral to Loan of Wm. Bolles this stock to remain the property of Geo. A. Bolles and to be surrendered to him upon payment of note of Wm. Bolles. Stock represented by 6 certificates of 100 shares each numbered T.1128 to 1133 inclusive.
 

 “By W. J. Pankhurst, asst, treas.”
 

 However, in connection with this transaction, there is testimony by William Bolles that his brother desired the receipt for the stock “because I took it out of Clara’s box.” And Mrs. Bolles testified, “He (George A. Bolles) suggested taking 600 shares of the LibbeyOwens stock out of the box to put up as additional collateral on this loan and asked me if I thought it was all right.” “I said I wanted to help Will in any way we could.”
 

 To sustain the'fact of a gift, Mrs. Bolles places much reliance on the testimony of seven witnesses who narrated statements attributed to Mr. Bolles over the span of years from 1927 to 1932. Those statements and the persons who testified to them are as follows:
 

 Albert P. McKee, friend and one-time office associate: “He told me that he had added another block of Libbey-Owens stock and had salted it in the deposit box for 01a,ra.”'
 

 
 *26
 
 William Bolles, brother: “The substance of his talk to me there was that he gave his wife some securities and he put them in her safety deposit box.”
 

 Sadie Crissey Foreman, friend: “He said, ‘I have been working very hard with Mrs. Bolles’ real estate but I couldn’t carry on with it if it wasn’t for our good stocks which I have had to use to carry it. * * * I have given her the stock and we keep it in her safety deposit box so that if anything would ever happen to me, she would have the stock and could give the other two children their share of it.’ ”
 

 Charles J. Danberg, former employee and friend: “He said, ‘I planted that stock in that deposit box for Mrs. B.’ and he wouldn’t touch that or loan me any of it.”
 

 Mrs. Charles J. Danberg: “Well, he talked about having created a trust for Barbara and the deposit box —the contents of the deposit hox was Mrs. Bolles.” Russell M. McCown, chauffeur: “Mr. Bolles said, ‘Well, Clara, I am glad that is settled, it is just salted down in case.’ And then he added, ‘Everything in that box is yours.’ ”
 

 Carolyn Bolles, adopted daughter: “Well, dad told me that he wanted me to go with mother to the safety deposit box and we were to look for my guardianship papers, that is what we were looking for, and he said he wanted me to go with mother because he wanted her to prove she could get in the box without him, because everything that was there was hers.”
 

 Perhaps the most extended and comprehensive definition of the necessary elements to constitute a completed gift
 
 inter vivos
 
 found among the decisions of this court is contained in the case of
 
 Flanders
 
 v.
 
 Blandy,
 
 45 Ohio St., 108, 113, 12 N. E., 321, 322, where it is said:
 

 “A gift
 
 inter vivos
 
 has been defined as an immediate, voluntary and gratuitous transfer of his personal
 
 *27
 
 property, by one to another. It is essential to its validity that the transfer be executed, for the reason that there being no consideration therefor, no action will lie to enforce it. A gift
 
 inter vivos
 
 has no reference to the future, but goes into immediate and absolute effect. To render the gift complete, there must be an actual delivery of the chattel, so far as the subject is capable of such delivery, and without such a delivery the title does not pass. If the subject is not capable of actual delivery, there must be some act equivalent to it. ‘ The necessity of delivery,’ says Chancellor Kent, ‘has been maintained in every period of the English law.’ The donor must part not only with the possession, but with the dominion and control of the property. An intention to give is not a gift, and so long as the gift is left incomplete, a court of equity will not interfere and give effect to it.”
 

 “Gifts
 
 inter vivos,
 
 like gifts
 
 ccmsa mortis,
 
 are watched with caution by the courts, and to support them clear and convincing evidence is required.”
 
 Flanders
 
 v.
 
 Blandy, supra,
 
 page 113;
 
 Gano
 
 v.
 
 Fish,
 
 43 Ohio St., 462, 469, 3 N. E., 532, 54 Am. Rep., 819.
 

 There are other decisions by this court enunciating the same principles, and in accordance with the weight of authority elsewhere they may be summarized in the statement that to support a gift
 
 inter vivos,
 
 there must be clear and convincing proof, first, of an intention on the part of the donor to transfer the title and right of possession of the particular property to the donee then and there, and, second, in pursuance of such intention, a delivery by the donor to the donee of the subject-matter of the gift to the extent practicable or possible considering its nature, with relinquishment of ownership, dominion and control over it.
 

 Certificates of corporate stock, negotiable instruments, bank books, and choses in action evidenced by writing generally, may be the subjects of gifts without
 
 *28
 
 assignment or endorsement, but to make effective gifts of such objects, carrying rights to all they represent, there must be the present intention to give plus delivery. 12 Ruling Case Law, 942, Section 19;
 
 Polley and Hicks, Admrs.,
 
 v.
 
 Hicks,
 
 58 Ohio St., 218, 221, 50 N. E., 809, 41 L. R. A., 858;
 
 Rothwell
 
 v.
 
 Taylor,
 
 303 Ill., 226, 135 N. E., 419; 25 A. L. R., annotations beginning at page 642,
 
 et seq.
 

 An examination of a number of authorities, with due regard for their reasoning, is persuasive that a transfer of certificates of corporate stock on the books of the corporation is not requisite to a valid completed gift of such certificates as between the donor and donee, and further that the provisions of the Uniform Stock Transfer Act (Sections 8673-1 to 8673-23, General Code), to' the effect that title to certificates shall pass by endorsement as of the time of the registration of the transfer, do not alter the rule, because such provisions were inserted for the protection of the corporation alone, so that it might safely deal in the payment of dividends, or otherwise, with the person in whose name the stock was registered.
 
 Re Estate of Connell, Deceased,
 
 282 Pa., 555, 128 A., 503, 38 A. L. R., 1362, and annotations beginning on page 1366;
 
 In re Antkowskis’ Estate,
 
 286 Ill. App., 184, 3 N. E. (2d), 132.
 

 The real stumbling block we meet in this case is the matter of delivery. Is there clear and convincing evidence of the delivery of the securities involved, with relinquishment of dominion and control over them? Where is the definite and tangible proof as to how, when and where any such delivery occurred?
 

 We think the testimony relating to alleged declarations by Mr. Bolles that he had given securities to his wife competent and relevant as bearing upon the main issue in the case. Substantial parts of it have heretofore been quoted in this opinion. Such testimony un
 
 *29
 
 mistakably carries the conclusion that Mr. Bolles considered he had made a gift of securities he owned at certain times. But wherein does it divulge compliance with the procedure and requirements which the law says are essential to the completion of a valid gift
 
 inter vivos?
 

 Appropriate to a situation of this kind, and applicable to those jurisdictions that adhere to the rule of strict proof to establish gifts, are the remarks of the court in
 
 Atchley, Exr.,
 
 v.
 
 Rimmer,
 
 148 Tenn., 303, 323, 255 S. W., 366, 372, 30 A. L. R., 1481, 1491, as follows:
 

 “We believe the better rule, the one sustained by reasons of public policy and the greater weight of the authorities is that the fact of delivery must be shown by other evidence than the mere declaration of the donor, when the declaration can go no further than to express a gift, and it does not either distinctly state a delivery or facts from which actual delivery may be inferred. * * * The law looks upon the repetition of statements, of this sort with very great care and caution in any kind of a case, and, when the statements are depended upon to carry conclusions, of law, as well [as] of fact, as in a case of- this kind, the statements attributed to the donor must include statements of all the facts necessary to constitute the conclusion.”
 

 And in
 
 Reynolds
 
 v.
 
 Kenney, Admr.,
 
 87 N. H., 313, 179 A., 16, 18, 98 A. L. R., 751, 754, the court states:
 

 “To say that a declaration, ‘She has some bonds which I gave her,’ unsupported by any other evidence of a delivery, includes the statement, ‘I delivered them to her as a gift,’ seems to us to assume a declaration of the fact of delivery which is not in evidence. The declarant may have been wholly ignorant of the law that no gift is valid without delivery, and the trier of fact is left to mere conjecture that the declaration involved anything more than a mistaken belief that a valid gift had been made. Until the declaration may
 
 *30
 
 be seen to include a statement of delivery as a matter of fact, it is not evidence of a delivery.”
 

 The proposition is put even more strongly in
 
 Chambers
 
 v.
 
 McCreery,
 
 (C. C. A. 4), 45 C. C. A., 322, 106 F., 364, (similar in some of its facts to the instant case), where the court says near the end of the opinion: “It is now well settled that the declaration of a donor that he had given the property in controversy to the claimant thereof will not perfect a gift incomplete for want of actual delivery, and the fact of delivery must be shown by other evidence than the mere declaration of the donor.” See, also,
 
 Casey
 
 v.
 
 Topliffe,
 
 (C. A., D. C.), 80 F. (2d), 543.
 

 For an exposition of the contrary rule compare
 
 Zollicoffer
 
 v.
 
 Zollicoffer,
 
 168 N. C., 326, 84 S. E., 349.
 

 Certain undisputed evidence in this case is indicative that there was no such delivery, including surrender of dominion, as the law demands. Among the indicia are the facts that the securities were contained in a box to which George A. Bolles had free access and to which he made frequent visits; that they were kept and found in a folder bearing his name or initials; that they stood in his name without endorsement or assignment; that he exercised incidents of ownership in the manipulation of certain of the securities at different periods and that he collected the dividends and interest therefrom and deposited the same to his individual account in the bank.
 

 Considering the disposition made by Mr. Bolles of his estate by will and trust agreements, his amicable relationship with the various members of his family and his generosity toward them, together with other evidence in the case, including his declarations from time to time that he had given the securities in the safety deposit box to his wife, there can be little doubt that he intended his wife to have the securities and thought he had effectuated such desire, but we are
 
 *31
 
 equally satisfied that there is not that quantum of positive evidence to show necessary compliance with the mandates of the law respecting the consummation of a, gift. In other words, the evidence as a whole does not present the clear and convincing details of a gift accomplished — a complete severance of the ties of ownership by the donor with absolute and irrevocable finality. It is essential to a gift
 
 inter vivos
 
 “that there be such a change of possession as to put it out of the power of the giver to repossess himself of the thing given.”
 
 People
 
 v. Csontos, 275 Ill., 402, 406, 114 N. E., 123, 124. That Mr. Bolles may have been unaware of the legal requirements for a completed gift is beside the point.
 

 No matter what the inclination of a court might be toward upholding the contention of a valid gift under circumstances like those before us, it has no right to supply omissions in the evidence to arrive at that result.
 

 Having decided this case adversely to the appellee for the reason that delivery was not proved, we find it unnecessary to discuss or pass upon other questions argued by counsel, notably Mrs. Bolles’ competency as a witness in the Court of Common Pleas.
 

 The judgment of the Court of Appeals must be reversed and final judgment rendered for the appellants.
 

 Judgment reversed.
 

 WeygaNdt, C. J., Stephenson, Williams, Jones, Matthias and Day, JJ., concur.'