*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 10a0348p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

    *v.*

No. 09-3730

MONEA FAMILY TRUST I; BROOKE MONEA;
BLAKE MONEA,

        *Interested Parties-Appellants.*

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 07-00030-002—John R. Adams, District Judge.

Argued: July 30, 2010

Decided and Filed: November 8, 2010

Before: GILMAN and WHITE, Circuit Judges; WATSON, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Thomas R. Houlihan, AMER CUNNINGHAM CO., L.P.A., Akron, Ohio, for Appellants. Herbert J. Villa, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee. **ON BRIEF:** Thomas R. Houlihan, AMER CUNNINGHAM CO., L.P.A., Akron, Ohio, for Appellants. Herbert J. Villa, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, Robert E. Bulford, ASSISTANT UNITED STATES ATTORNEY, Akron, Ohio, for Appellee.

    GILMAN, J., delivered the opinion of the court, in which WATSON, D. J., joined. WHITE, J. (pp. 13–14), delivered a separate concurring opinion.

_____

[*]The Honorable Michael H. Watson, United States District Judge for the Southern District of Ohio, sitting by designation.

————————————

**OPINION**

————————————

RONALD LEE GILMAN, Circuit Judge.  Paul Monea and a coconspirator were convicted of participating in a money-laundering scheme to hide the proceeds of drug trafficking.  The district court subsequently granted a preliminary order of forfeiture regarding several items of personal property used in the scheme, including a large diamond that purportedly belonged to Monea.  Several parties filed petitions to amend the order of forfeiture on the basis of their alleged ownership interest in the diamond, including the Monea Family Trust I–1999 (the Trust), of which Monea and two of his children were beneficiaries.  Holding that the government's interest in the diamond was superior to that of all of the claimants, the district court denied the various petitions.

The Trust now appeals the district court's order.  For the following reasons, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

### A.     Factual background

The Trust was established in 1999 by Deborah Douglas, who named as beneficiaries her children, Blake and Brook Monea, and her then-husband, Paul Monea (hereinafter referred to as Monea).  John Tuggle, a business acquaintance of Monea, was appointed as trustee.  Under the terms of the Trust Agreement, the trustee could be removed by Monea or by a majority vote of all of the beneficiaries.  Monea also had the singular authority to appoint new trustees.  The Trust was initially funded with $1,000, but later acquired ownership of a home near Warren, Ohio that was previously owned by former boxer Mike Tyson.

In 2005, Monea completed a term of imprisonment that he had been serving for an unrelated tax-evasion conviction.  Upon his release, Monea discovered that Tuggle

had misappropriated well in excess of $100,000 of Trust funds. This caused Monea to remove Tuggle as the trustee in November 2005.

Tuggle's replacement died unexpectedly soon after being appointed. Monea then asked Michael Miller, an acquaintance of Monea's who owned a car dealership, to serve as the trustee. During the subsequent months, Miller introduced Monea to John Rizzo, a sales broker for whom Miller was laundering drug money. Unbeknownst to either Miller or Monea, Rizzo was actually an undercover agent with the Federal Bureau of Investigation (FBI).

Monea and Rizzo first met on March 30, 2006 to discuss the possibility of Rizzo supplying cash for some of Monea's business ventures. The two men met again on May 19, 2006 in Los Angeles, California. During this meeting, which Rizzo recorded, Monea mentioned "a diamond that I own," although he did not seek Rizzo's assistance in selling it at the time. The diamond to which Monea referred is a 43.51 Carat Modified Rectangular Brilliant Yellow Diamond Internally Flawless with Fancy Intense Grate known as the "Golden Eye." There is no clear evidence of how Monea first came to possess the diamond, but he told others involved in this case that he owned a diamond mine in Africa and that he received the diamond from a friend.

Prior to being imprisoned for tax evasion, Monea had borrowed $500,000 from a man named Michael Dillard, who owned a pawn shop in Oklahoma. Monea used the money to pay taxes that he had owed. He left the diamond in Dillard's possession as collateral for the loan. Around the time that Monea first met Rizzo, he borrowed another $500,000 from an acquaintance named Gerald Deleo to pay off the Dillard loan and reacquire the diamond. Deleo also gave Monea an additional $30,000 shortly thereafter to have the diamond readied for sale by gemologists in New York. Monea led Deleo to believe that the latter would receive an ownership interest in the diamond in exchange for the monies advanced. Deleo had the diamond in his possession for two to three weeks sometime after it was readied for sale, during which time Deleo unsuccessfully searched for a potential buyer.

In June 2006, Miller, in his capacity as trustee, appointed an acquaintance named David Ramsey as an agent of the Trust for the limited purpose of retrieving the diamond from a jeweler in Oklahoma who was holding the diamond on behalf of Dillard. This arrangement was made, according to Miller, so that the "paper trail" showed "that the trust bought the stone for $500,000." Monea and Rizzo spoke shortly after Ramsey retrieved the diamond, but Monea again did not ask Rizzo for help in finding a buyer for the gemstone.

In August and September 2006, Monea and Ramsey engaged in discussions with representatives from the Charity Fellowship of Truth Church, located in Avon, New York, regarding the purchase of a lake house in Massillon, Ohio. Monea had rented the house in the past and had used it to host business associates while negotiating contracts and discussing his various entrepreneurial ventures. But by August 2006, the home was in danger of going into foreclosure. Pursuant to the purchase agreement, the church would buy the lake house from its current owners for approximately $2.5 million. The Trust then agreed to purchase the home from the church for $3 million within one year thereafter.

To secure the Trust's obligation to ultimately buy the home, the church was to receive a 50 percent interest in the diamond, as memorialized in a separate "Certificate of Giving" signed on the same day as the purchase agreement. According to the purchase agreement, the diamond would be sold, with the proceeds from the sale to first be used to buy the lake house from the church for $3 million. The remaining balance from the sale of the diamond would belong to the Trust.

Church representatives present during these discussions testified that Monea and Ramsey conveyed the impression that the diamond belonged to the Trust and that Ramsey was acting as the Trust's agent. They further stated that Miller was present at a Canton, Ohio country club where both the purchase agreement and the Certificate of Giving were signed in September 2006. Miller acknowledged meeting the church representatives at his home earlier on the day in question. Although Miller never testified as to whether he was present at the country club when the documents were

signed, he denied participating in any negotiations between the church and Monea and maintained that he was never informed of any agreement reached by the two parties. Moreover, Miller said that he had not authorized Ramsey to act on behalf of the Trust beyond retrieving the diamond from Dillard's jeweler in Oklahoma. Ramsey, however, signed both documents on behalf of the Trust, and Monea signed the purchase agreement as an "acting Trustee" for the Charity Fellowship of Truth Church.

Following these negotiations, Monea, Ramsey, and Reverend David Moore from the church took the diamond to Los Angeles and Las Vegas to show to potential buyers. During part of this time, Reverend Moore had the diamond in his possession without either Monea or Ramsey being present. Miller was never informed that these showings were taking place or that Reverend Moore at times had sole custody of the diamond.

That fall, Miller and Monea continued their efforts to sell the diamond, with Miller hiring at least two different brokers in October 2006 to assist them in finding a buyer. Miller and Monea met with Rizzo again on October 17, 2006. This time their discussion, which Rizzo recorded, revolved around Rizzo finding a buyer to purchase the diamond for $15 million. During their conversation, Monea maintained that he was "just trying to sell on behalf of the trust an asset that the trust has." Miller added that any money from the sale was "going in the trust."

In early November 2006, Monea and Rizzo reached an agreement in which Monea agreed to sell the diamond to drug dealers who Rizzo knew in exchange for $19.5 million and a boat. Discussions regarding commissions, the payment of earnest money, and the wiring of funds continued through mid-December. Monea typically handled these negotiations, with little meaningful involvement from Miller, and he met with Rizzo on one occasion in Las Vegas without Miller being present. On another occasion in November 2006, when Monea believed that he was nearing the close of a deal, he told a potential buyer that "I think I got my diamond sold."

Monea also gave Miller a list detailing how the proceeds of the sale were to be disbursed. A majority of the payments to be made were unrelated to either the debts or

investments of the Trust, and several payments were to be used to discharge personal debts incurred by Monea.

On December 13, 2006, Monea, Miller, and Rizzo met at the office of the Trust's lawyer, Jack Morrison, to complete the sale of the diamond. Morrison had prepared several documents to complete the transaction, including a bill of sale, an acknowledgment and receipt, and a tax return, all of which indicated that the Trust owned the diamond. At the close of the meeting, Miller and Monea were arrested by the FBI.

## B.    Procedural background

A grand jury charged Monea with one count of conspiracy to launder money, in violation of 18 U.S.C. § 1956(h), and three counts of money laundering, in violation of 18 U.S.C. § 1956(a). Miller was charged with one count of conspiracy to launder money and 36 counts of money laundering. The superseding indictment also sought forfeiture of several pieces of personal property and real estate used in the money-laundering scheme, including the diamond.

Following a jury trial, Monea was convicted on all four counts and was sentenced to 150 months' imprisonment. The jury also found that the diamond was involved in the four counts with which Monea was charged. For his part in the scheme, Miller pled guilty pursuant to a plea agreement and was sentenced to 57 months' imprisonment.

In June 2007, the district court entered a preliminary order of forfeiture that authorized the government to seize various properties used in the money-laundering scheme, including the diamond. Several parties, including the Charity Fellowship of Truth Church, Deleo, and the Trust, filed petitions seeking to establish ownership of the diamond. After the court denied the government's motion to dismiss all but one of the petitions, it held a three-day forfeiture hearing in October 2007.

During the hearing, several witnesses testified that the diamond was a Trust asset. Miller, as well as the current trustee, Nancy McCann, both testified that the Trust owned the diamond. Blake Monea similarly testified that he had always understood that the

diamond belonged to the Trust.  None of these witnesses, however, were able to identify any document that established the Trust's ownership of the diamond.  Furthermore, both Miller and Blake Monea testified that they arrived at their conclusions regarding the Trust's ownership based solely on representations made by Paul Monea.

Other evidence introduced at the hearing indicated that the Trust did not own the diamond.  Tuggle testified that the diamond never became a trust asset while he was serving as trustee.  John Tanza, the undercover agent posing as Rizzo, likewise testified that when he first discussed finding a buyer for the diamond, Monea stated that the diamond was his.  Also undercutting the Trust's claim of ownership was an affidavit of Paul A. Monea (one of Monea's sons) that was filed in a bankruptcy case involving the son's business.  In the affidavit, Paul A. Monea stated that "[t]o the best of my knowledge the diamond was and is owned by Paul M. Monea, my father, in his individual capacity."

The legitimacy of the Trust was also called into doubt at the hearing.  Tuggle, for example, conceded that when he was trustee, Monea had him "step and fetch and do whatever [Monea] said."  The Trust, Tuggle further admitted, was in reality Monea's "private slush fund[]."  Tanza similarly testified that, based on his conversations with Monea and Miller, "the reason for the trust was to protect the assets of Mr. Monea from any type of attack from either legal or civil actions."

As for Miller, in describing his role as trustee, he stated that he was not involved in the negotiations with brokers to sell the diamond and would simply sign whatever broker agreements that Monea presented.  Miller also testified that Monea directed him to sign a document designating Ramsey as an agent of the Trust for the purpose of picking up the diamond from Dillard's jeweler in Oklahoma.  He further recalled that he "never had the diamond in my possession, ever"; instead, Monea usually carried the diamond in a velvet bag in his pants pocket, although Ramsey would "sometimes" carry it in his pocket.

Following the hearing, the district court denied all of the petitions seeking ownership of the diamond.  Specifically, the court found that the government's interest

in the diamond vested on March 30, 2006, the date on which Monea first spoke with Rizzo, because that was when the conspiracy first began.  The court further concluded that Monea never "surrendered ownership and control of the diamond" to the Trust and that he "always treated the diamond as his own, despite his representations that it was an asset of the estate."  Moreover, the court questioned the validity of the Trust.  Although the court declined to make a formal ruling, it noted that "there is strong evidence that the Trust itself was a sham."  Finally, the court held that none of the other claimants had established an interest in the diamond superior to that of the government's.  This timely appeal of the district court's order, brought by the Trust only, followed.

## II.  ANALYSIS

### A.     Standard of review

We review de novo a district court's interpretation of federal forfeiture law. *United States v. Jones*, 502 F.3d 388, 391 (6th Cir. 2007).  Although findings of fact are reviewed under the clear-error standard, "[t]he issue of whether those facts are sufficient to constitute a proper criminal forfeiture is reviewed de novo."  *Id*.

### B.     The Trust's interest in the diamond

Pursuant to 21 U.S.C. § 853(n)(6), a district court can amend an order of forfeiture in only two circumstances.  The first of these circumstances is where "the petitioner has a legal right, title, or interest in the property" that "was vested in the petitioner . . . or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property."  *Id*. § 853(n)(6)(A).  Amending an order of forfeiture is also appropriate where "the petitioner is a bona fide purchaser for value of the right, title, or interest of the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under such section."  *Id*. § 853(n)(6)(B).

To succeed on a petition to amend a forfeiture order, a claimant must establish ownership by a preponderance of evidence. *Id*. § 853(n)(6).  The Trust does not argue that it was a bona fide purchaser of the diamond, so we need address only whether the

Trust had a vested interest in the diamond when the acts giving rise to the money-laundering conspiracy occurred. Both parties agree that Ohio law governs. We must therefore determine (1) whether the Trust had a legal right, title, or interest in the diamond, and (2) if so, whether that right, title, or interest vested prior to the government obtaining its interest.

Turning to the first issue, we note that there is no dispute that the first person to possess the diamond among all of the interested parties was Monea. There is also no evidence of any document granting the Trust an ownership interest in the diamond. In light of these facts, the district court limited its analysis to whether Monea had gifted the diamond to the Trust, thereby implying that this was the only remaining method that could have resulted in the transfer of ownership from Monea to the Trust. Neither side has indicated that any other method of transfer occurred.

Two conditions must be met under Ohio law for a gift to be made. First, there must be "an intention on the part of the donor to transfer the title and right of possession of the particular property to the donee." *Bolles v. Toledo Trust Co.*, 4 N.E.2d 917, 920 (Ohio 1936). Second, there must be "a delivery by the donor to the donee of the subject-matter of the gift to the extent practicable or possible considering its nature, with relinquishment of ownership, dominion, and control over it." *Id.* Each of these conditions must be supported by clear and convincing evidence. *Id.* Because this standard is higher than that for establishing an ownership interest under 21 U.S.C. § 853(n)(6), a finding that Monea gifted the diamond to the Trust would necessarily result in a finding that the Trust has an ownership interest in the diamond.

Regarding the question of donative intent, the district court concluded that, "[a]t best, . . . Monea's repeated assertions that the diamond was an asset of the Trust" evidenced his intent to make a gift to the Trust. Neither party has challenged the court's ruling in this regard.

We therefore turn our attention to the second element—whether Monea delivered the diamond to the Trust by relinquishing ownership, dominion, and control over it. The Trust contends that such delivery took place when Ramsey picked up the diamond from

the jeweler in Oklahoma because Ramsey was acting as an agent of the Trust at that time. Once Ramsey retrieved the diamond, however, he never gave it to the Trust. Rather, Monea permitted Deleo to have the diamond for two to three weeks while shopping it to potential buyers. There is no evidence that the Trust approved or was ever aware of this arrangement.

Upon repossessing the diamond, Monea typically carried it in his pants pocket, with Ramsey "sometimes" doing the same. On the other hand, Miller, then serving as the trustee, never had the diamond in his possession and had no input "on where the diamond would go and where it would be." The fact that Monea and Ramsey never surrendered possession of the diamond to the trustee weighs strongly against a finding of delivery to the Trust. *See LCP Holding Co. v. Taylor*, 817 N.E.2d 439, 445 (Ohio Ct. App. 2004) (holding that "delivery occurred when appellee surrendered possession of the stock and endorsed the stock to his children as owners").

In addition to not surrendering possession of the diamond, Monea continued to keep it for his personal use. He promised Deleo an interest in the diamond in exchange for money to pay off Monea's debt to Dillard and to have the diamond readied for sale. Soon thereafter, Monea and Ramsey entered into a Certificate of Giving with Charity Fellowship of Truth Church that granted the church a 50 percent security interest in the diamond. Although Ramsey stated in the Certificate that he was acting on behalf of the Trust, Miller denied any knowledge of the church obtaining an interest in the diamond or that Monea and Ramsey were even participating in such negotiations. Miller was also never informed that Monea, Ramsey, and Reverend Moore were showing the diamond to potential buyers in Los Angeles and Las Vegas or that Reverend Moore at times had sole custody of the diamond.

The Trust defends these actions by claiming that both Monea and Ramsey were acting as agents of the Trust, but we find this argument unpersuasive. There is no evidence in the record that the Trust ever appointed Monea to be an agent or entrusted him with the diamond in any other capacity. In fact, the only evidence that Monea was negotiating on behalf of any party is when he signed the purchase agreement as a trustee

*of the church*. And although documentation exists appointing Ramsey as an agent of the Trust, it specifically limited his authority to "the purpose of delivering $500,000 (Five Hundred Thousand Dollars) payment to Mike Dillard and the receipt of any material at the time of payment." Monea and Ramsey then proceeded to engage in negotiations to sell the diamond not only without the Trust's knowledge, but also well beyond any scope of agency that either potentially had with the Trust.

The evidence also shows that the primary beneficiary of these negotiations was to be Monea himself rather than the Trust. Monea sought ownership of the Massillon lake house so that he could continue to entertain business clients at the residence, and the majority of the proceeds from the planned December 2006 sale of the diamond was earmarked for Monea's personal debts and investments. He even referred to the gemstone as "my diamond" on at least one occasion during conversations with potential buyers. And because Monea continued to use the diamond for his own purposes and did not surrender possession of it, delivery of the diamond to the Trust never occurred.

The Trust nevertheless contends that testimony from the forfeiture hearing regarding its ownership of the diamond was unrebutted and therefore conclusively establishes that the diamond was a Trust asset. To support this assertion, the Trust relies upon *Howard v. Himmelrick*, No. 03AP-1034, 2004 WL 1405293 (Ohio Ct. App. June 24, 2004). In *Howard*, the fiancée of a recently deceased man sued to recover possession of several pieces of personal property located in the man's home when he died, but which she claimed were hers. Following a hearing, the trial court determined that the property belonged to the fiancée. The man's children, who had refused to surrender possession of the items, argued on appeal that this ruling was against the manifest weight of the evidence. Although the only evidence that the fiancée had retained ownership of the property was her own testimony, there was no other evidence refuting her statements. The Ohio Court of Appeals held that such unrebutted testimony was "competent and credible evidence" of ownership and, accordingly, that the trial court's ruling was not against the manifest weight of the evidence. *Id*. at *3.

But the Trust misreads *Howard*. In that case, the deceased's children challenged the trial court's determination that the disputed personal property belonged to the fiancée. The Ohio Court of Appeals rejected the children's argument in light of the fiancée's testimony that she had not given the items to the deceased and the lack of any evidence to the contrary. *Howard*, 2004 WL 1405293, at \*3.

In contrast, there is significant evidence in the present case supporting the conclusion that Monea never made a gift of the diamond to the Trust. *Howard* is therefore distinguishable. In sum, the Trust has not shown by clear and convincing evidence that Monea ever relinquished ownership, dominion, and control over the diamond. *See Bolles v. Toledo Trust Co.*, 4 N.E. 2d 917, 920 (Ohio 1936). The district court thus did not err in finding that no gift had been made. We therefore have no need to address the Trust's claim that its interest in the diamond vested prior to the government's forfeiture claim.

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

---

**CONCURRENCE**

---

HELENE N. WHITE, Circuit Judge (concurring).  I write separately to make clear that my concurrence is based on the deference owed to the district court as finder of fact, and on the unique facts of the case.  I do not regard Monea's retention of considerable control over the diamond and the trustee as invalidating an intended gift to the trust, if such a gift was in fact intended.

The trust at issue here was a family trust, created by Monea's ex-wife for Monea and their children.  The ex-wife did not fund the trust, except in an insignificant amount.  Apparently, the parties contemplated that Monea would do so if he chose.  In such situations, it is common for the co-beneficiary/parent/donor to give assets to the trust and simultaneously exercise a significant degree of control over the assets.  It is also common for settlors of trusts, or beneficiaries granted the power, to name trustees over whom they have considerable control.  Although this degree of control may possibly have tax consequences, it does not negate the fact that the assets are owned by the trust.

Under the circumstances here, I do not think it was necessary for Monea to do more than declare the diamond to be a trust asset and so inform the trustee.  It has been said that bad facts make bad law, and I am concerned that we not do so here.  Had Monea not been involved in money laundering, but had remarried and left the residuary of his estate to his second wife, I doubt that we would hold that his retained control of the management of the diamond rendered it an asset of his estate, belonging to his second wife, rather than an asset of the trust, belonging to his children.

Notwithstanding these observations, however, I concur in the affirmance because I believe that there were circumstances from which the district court could have concluded that Monea's retained control and other conduct reflected that he intended that the diamond be an asset of the trust in name only, and did not intend to transfer true ownership to the trust.  Although the district court's analysis proceeded along a different path, I understand this to be the import of the district court's observation that "While

Monea consistently shopped the diamond to buyers and investors, there is no evidence that he did so with authority from the Trustee. Rather, the evidence indicates that Monea always treated the diamond as his own, despite his representations that it was an asset of the estate." On this basis, I concur.