[Cite as *Williams v. Williams*, 2012-Ohio-6116.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

BRADLEY S. WILLIAMS,

    PLAINTIFF-APPELLEE,          CASE NO.  13-12-17

    v.

GORDIA L. WILLIAMS,          O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Seneca County Common Pleas Court
Domestic Relations Division
Trial Court No. 09DR0371

**Judgment Affirmed**

Date of Decision:  December 26, 2012

APPEARANCES:

    *John C. Filkins* for Appellants

    *Randall S. Bendure*  for Appellee

Case No. 13-12-17

**SHAW, P.J.**

{¶1} Defendant-appellant Gordia L. Williams ("Gordia") appeals the December 29, 2011, judgment of the Seneca County Court of Common Pleas regarding various issues in the Final Decree of Divorce between Gordia and Bradley Williams ("Brad"). For the reasons that follow we affirm the judgment of the trial court.

{¶2} Brad and Gordia were married April 10, 1992. Three children were born as issue of the marriage, Matt Williams, born 1994, Mikayla Williams, born 1998, and Brock Williams, born 2003.

{¶3} At the time when Brad and Gordia began dating, Brad was living on a farm that his parents had purchased in 1988 for $125,000.[1] Brad and his father farmed the land and Brad also milked cows that he owned. Shortly before Brad and Gordia were married in 1992, Gordia moved onto the farm with Brad. In 1993, Brad's father died, leaving Brad's mother, Iola, as the sole owner of the farm. Iola discussed the farm with Brad and the other members of the family and decided she wanted Brad to have the farm. Iola then sold the farm to Brad for the amount owed on the mortgage, $122,000. Brad and Gordia jointly took out a mortgage for the farm and paid off Iola's mortgage. The deed was placed in both

---

[1] Brad's parents purchased the farm at a Sheriff's sale. The farm had a residence on it, but Brad's parents did not reside on the farm with Brad.

Brad's and Gordia's names. The two lived together at the farm until Brad filed for divorce.

{¶4} On November 24, 2009, Brad filed a complaint for divorce. (Doc. 2). On December 8, 2009, Gordia filed an answer and counterclaim for divorce. (Doc. 16). On January 13, 2010, Brad filed an answer to the counterclaim for divorce. (Doc. 32).

{¶5} The final hearing in this case took place on multiple dates: August 24-25, 2010, September 29, 2010, October 12, 2010, October 20-21, 2010, December 7, 2010, and May 2-3, 2011.[2]

{¶6} On March 10, 2011, Judge Shuff filed a judgment entry dismissing the magistrate who had presided over the previous portions of the final hearing in this case. (Doc. 122). Both parties signed waivers and agreed that Judge Shuff could have the testimony from the prior portions of the final hearing transcribed for Judge Shuff to read rather than have the parties re-present all of the evidence. (Docs. 116, 117).

{¶7} On June 28, 2011, the trial court filed a judgment entry ordering the parties' farm to be sold at auction. (Doc. 164). On October 7, 2011, a filing was made by Brad showing that the farm and other items had been sold at auction.

---

[2] In its entry on this matter, the trial court also stated that part of the final hearing was held February 1-3, 2011, but we have no transcripts from anything that transpired those days. (Doc. 222).

(Doc. 193). On October 14, 2011, the court filed a judgment entry confirming the sale of the farm and the other items. (Doc. 198).

{¶8} On October 31, 2011, the trial court filed a judgment entry again confirming sale of the farm and ordering distribution of proceeds from the sale. (Doc. 202). In the entry, the trial court found "by a preponderance of the evidence that the fair market value of the Property at the time it was originally purchased from Iola Williams was $220,000.00. The property was purchased for a total of $122,000.00. The remaining difference, totaling $98,000.00 was a pre-marital gift to Plaintiff from Iola Williams, and it is hereby ORDERED that Bradley Williams shall receive a credit of $98,000.00." (Emphasis *sic*) (Doc. 202).

{¶9} On November 9, 2011, Gordia filed a motion to modify the prior judgment entry finding that part of the property was a "premarital" gift to Brad from Iola. (Doc. 212).

{¶10} On December 29, 2011, the trial court filed its "Judgment Entry Final Decree of Divorce." (Doc. 222). The court's entry awarded custody of Mikayla and Brock, the parties' two youngest children, to Brad, and custody of Matt to Gordia. (*Id.*) The entry also stated that Gordia was voluntarily underemployed, imputing income to her in the amount of $33,280.57. (*Id.*) In addition, the trial court found that both parties had misappropriated funds throughout the pendency of this divorce and awarded no additional funds to either party. (*Id.*)

{¶11} On January 5, 2012, Gordia filed a motion for findings of facts and conclusions of law. (Doc. 223). On March 8, 2012, the court issued findings of facts and conclusions of law. (Doc. 230).

{¶12} Subsequently Gordia appealed from the final divorce decree, asserting the following assignments of error for our review.

**ASSIGNMENT OF ERROR 1**
**THE TRIAL COURT ERRED AS A MATTER OF LAW AS A RESULT OF ITS FINDING THAT THE APPELLEE RECEIVED A PRE-MARITAL GIFT OF AN INTEREST IN LAND TOTALING $98,000.00 WHEN THE LAND WAS PURCHASED AFTER MARRIAGE, FOR FAIR MARKET VALUE, AND WITHOUT THE BENEFIT OF ANY DONATIVE INTENT ON THE PART OF THE SELLER OF THE LAND.**

**ASSIGNMENT OF ERROR 2**
**THE TRIAL COURT'S DESIGNATION OF APPELLEE AS THE RESIDENTIAL PARENT OF TWO OF THE PARTIES' THREE CHILDREN WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND NOT IN THE BEST INTEREST OF THE MINOR CHILDREN.**

**ASSIGNMENT OF ERROR 3**
**THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY FINDING THAT SHE WAS VOLUNTARILY UNDEREMPLOYED.**

**ASSIGNMENT OF ERROR 4**
**THE TRIAL COURT'S DIVISION OF THE DEPENDENCY EXEMPTIONS FAILS TO COMPORT WITH OHIO LAW AND IS NOT IN THE BEST INTEREST OF THE MINOR CHILDREN.**

**ASSIGNMENT OF ERROR 5**
**THE TRIAL COURT ERRED AS A RESULT OF ITS FAILURE TO ORDER THE APPELLEE TO PAY TO APPELLANT THE SUM OF $3,000.00 REPRESENTING THE PROCEEDS OF THE INSURANCE COMPANY CHECK ISSUED AS A RESULT OF THE THEFT OF APPELLANT'S WEDDING RING.**

**ASSIGNMENT OF ERROR 6**
**THE TRIAL COURT FAILED TO FILE, PURSUANT TO THE MANDATES OF R.C. 3105.171(G), FINDINGS OF FACT OR CONCLUSIONS OF LAW ON ALL ISSUES.**

*First Assignment of Error*

**{¶13}** In Gordia's first assignment of error, she argues that the trial court erred in finding that Brad received a "pre-marital" gift of an interest in the farm totaling $98,000. Specifically Gordia contends that the "donative intent" element of a gift was not established, and that any gift would have been made during the marriage, not prior to the marriage, meaning that it could not have been a "pre-marital" gift.

**{¶14}** In generating its division of marital assets, the trial court must determine what assets constitute marital property subject to division. R.C. 3105.171(B); *Stump v. Stump*, 3d Dist. No. 8-07-11, 2007-Ohio-6553, ¶ 7. A trial court's order characterizing property as marital or separate is upheld unless it is against the manifest weight of the evidence. *Eggeman v. Eggeman*, 2004-Ohio-6050, at ¶ 14, citing *Henderson v. Henderson*, 3d Dist. No. 10-01-17, 2002-Ohio-2720, ¶ 28. Judgments supported by some competent, credible evidence going to

all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Const. Col*, 54 Ohio St.2d 279 (1978), syllabus. When reviewing a judgment under this standard, an appellate court must presume that the findings of the trier of fact are correct. *Seasons Coal Co., Inc. v. City of Cleveland*, 10 Ohio St.3d 77, 80-81 (1984).

{¶15} Under R.C. 3105.171(A)(6)(a)(vii), separate property includes "[a]ny gift of any real or personal property or of an interest in real or personal property that is made after the date of the marriage and that is proven by clear and convincing evidence to have been given to only one spouse." Clear and convincing evidence is "[t]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *In re Estate of Haynes*, 25 Ohio St.3d 101, 104 (1986). In addition, when "the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954). Thus, we are required to assess whether the trial court's determination was

supported by sufficient credible evidence to satisfy the requisite degree of proof. *In re McCann*, 12th Dist. No. CA2003-02-017, 2004-Ohio-283, ¶ 12.

{**¶16**} The essential elements of an *inter vivos* gift are: "(1) [the] intent of the donor to make an immediate gift, (2) delivery of the property to the donee, [and] (3) acceptance of the gift by the donee." *Barkley v. Barkley*, 119 Ohio App.3d 155 (4th Dist. 1997), at fn.2, 694 N.E.2d 989, citing *Bolles v. Toledo Trust Co.*, 132 Ohio St.21, 4 N.E.2d 917. "The donee has the burden of showing by clear and convincing evidence that the donor made an *inter vivos* gift." *Helton v. Helton*, 114 Ohio App.3d 683, 686 (2nd Dist. 1996), citing *In re Fife's Estate*, 164 Ohio St. 449, 456 (1956). However, "'[w]hen a transaction is made that benefits a family member, there is a presumption that the transaction was intended as a gift.'" *Osborn v. Osborn,* 11th Dist. No.2003-T-0111, 2004-Ohio-6476, ¶ 33, quoting *Davis v. Davis*, 5th Dist. No. 2003CA00243, 2004-Ohio-820, ¶ 8.

{**¶17**} In this case, the property in question is a farm located at 6631 E. TR 122, Republic, Ohio, 44867 (hereinafter referred to as "the farm").[3] The farm was purchased for $125,000 in 1988 by Brad's parents, Don and Iola, at a Sheriff's sale. Shortly after the farm was purchased, Brad moved into the residence on the farm. Brad's parents still resided separately from the farm in question. Brad then farmed the land along with his father (Brad also had some milking cows).

---

[3] The trial court's entry stated that the property was "legally known as being 160 acres in the SE ¼ of Section 8, T0, R0, in Scipio Township, Seneca County, State of Ohio, with Parcel Number L41000646760000." (Doc. 222).

Sometime in the months prior to the parties' marriage in April of 1992, Gordia moved onto the land with Brad.[4] Subsequently in April of 1992, the parties were married.

{¶18} In 1993, Brad's father died, making Brad's mother Iola the sole owner of the farm. Brad's mother sat down with the family (Brad and Brad's brothers) to decide what to do with the farm. (Iola Williams Depo. at 26-27). Ultimately, the family decided Brad should get the farm so long as Brad took out his own mortgage to pay what Iola owed on the property. (*Id.*) Iola still owed a total of approximately $122,000 on the farm.

{¶19} Ag Credit, the company doing the mortgage for Brad and Gordia, did an appraisal of the farm in 1993, showing the farm to be worth approximately $220,000 ($160,000 for the land, $60,000 for the residence/buildings). Subsequently Brad and Gordia jointly took out a mortgage for the farm and paid the $122,000 owed. The deed to the farm was transferred from Iola to Brad and Gordia. Brad and Gordia lived on the farm throughout the marriage until separation. During the pendency of this divorce, the farm was ordered to be sold at auction.

{¶20} In the trial court's entry regarding the sale of the farm and the distribution of the proceeds, the trial court held the following:

---

[4] It is unclear the exact date Gordia moved onto the farm, but "months" before the marriage is the term used in testimony by Brad. *See* (Aug. 25, 2010 Tr. at 300).

**The Court further finds by a preponderance of the evidence that the fair market value of the Property at the time it was originally purchased from Iola Williams was $220,000.00. The Property was purchased for a total of $122,000.00. The remaining difference, totaling $98,000.00 was a pre-marital gift to Plaintiff from Iola Williams, and it is hereby ORDERED that Bradley Williams shall receive a credit of $98,000.00.**[5]

(Doc. 202). The trial court's "Findings of Fact and Conclusions of Law" reflected this analysis.[6]

**{¶21}** Gordia argues on appeal that the facts of the case do not establish a donative intent on behalf of Iola when Iola transferred the property and thus no valid gift was made from Iola to Brad. Gordia also argues that Iola did not know at the time of the transfer exactly how much the farm was worth and thus could not have had the intent to bestow a gift upon Brad.

**{¶22}** Although Iola did not testify at the final hearing, she did give testimony via a deposition. Regarding the farm at issue, Iola testified to the following:

---

[5] While the trial court cites a burden of proof in this paragraph being "preponderance of the evidence" we find that statement is only made in reference to the trial court's holding regarding the value of the property at the time it was originally purchased, as that value was in dispute throughout the final hearing. However, we also acknowledge that the trial court did not separately specify any burden of proof in its finding of a gift in this paragraph or anywhere else in this entry.

[6] In its findings of fact and conclusions of law, the trial court held the following:

> The Property was purchased by the parties from Plaintiff's mother, Iola Williams, on August 9, 1993, for the amount of $122,000.00. The Property had a fair market value of $220,000.00 at the time it was purchased by the parties. The remaining $98,000.00 in the value of the Property over the purchase price of (sic) was a pre-martial gift from Iola Williams to Plaintiff, and is Plaintiff's separate property. The Property was sold at court-ordered auction on October 5, 2011.

(Doc. 230).

**Q.   [Mr. Filkins—Gordia's attorney] Could you tell us, did you know the value of the land at the time you sold it in 1993?**

**A.   [Iola Williams] Yes.**

(Iola Williams Depo. At 24).

* * *

**Q.   All right.   In this particular case, do you remember how much you were going to sell the farm, the Hall property to Brad and Gordia for?**

**A.   Well, land had gone up and there was (sic) lot of improvements made.**

* * *

**A.   It was probably, I don't know, probably in the neighborhood of $250,000.**

**Q.   What was in the neighborhood of $250,000?**

**A.   The value of the farm.**

**Q.   And why – Why do you say that?**

**A.   Well, of all the improvements that was made, and I guess land had gone up.**

(*Id*. at 23)

* * *

**Q. What did you look to to determine the value of the property before selling it to Brad and Gordia?**

**A. I believe that was based on the place where Brad got his loan.**

(*Id.* at 35).

**\* \* \***

**Q. Okay. Could you tell me, you said something about Brad getting a mortgage.**

**A. Yes.**

**Q. And that somehow established for you the value.**

**A. Yes.**

**Q. Okay. What were you referring to? Was there some sort of document that –**

**A. Pardon.**

**Q. Was there some sort of document that Brad obtained?**

**A. I think that there was.**

**Q. Okay. Do you know where that document is today?**

**A. No I don't.**

**Q. Okay. Now, this value that you're saying of $250,000, you're saying that comes from a document that you believe you would have seen back in 1993?**

**B. Hm-hmm.**

(*Id.* at 35-37).

\* \* \*

**Q. All right. Let me ask you this: You said that Brad took out a mortgage. Are you aware that both Brad and Gordia took out that mortgage to pay you?**

**A. No, I thought Brad just did.**

**Q. All right. And why did you think just Brad took out the mortgage?**

**A. Well, it was the family wish, or what, you know, they agreed that he should take out the mortgage and it would go to him.**

**Q. Okay. Are you aware that Gordia then is on or was on that mortgage?**

**A. No I wasn't.**

(*Id.* at 27).

\* \* \*

**Q.  Was it your intention that both Gordia and Brad were to get the farm in 1993?**

**A.  No, not really.**

(*Id*. at 29).

\* \* \*

**Q.  Okay.  How did that issue come up between you and Brad before you met with Mr. Bendure [Brad's attorney] about the value of the land back in 1993?**

**A.  Oh, I guess, I don't know, he wondered how come, [sic] sold it for the amount that we paid for it, to have him, let him take over the mortgage when the stuff had all gone up.**

\* \* \*

**A.  That I said, well, I guess, that he was my son and the remain – it would just be a *gift* from me.**

(Emphasis Added.) (*Id*. at 45).

\* \* \*

**Q.  [Mr. Bendure].  Okay.  Did you know in your mind that the farm was worth more, worth more than what Brad was paying for it on the mortgage?**

**A.  Yes.**

-14-

**Q. Okay. And was it the intent for any, I call a windfall, for any – for any value in excess of the mortgage value to go to Brad?**

**A. Yes.**

**Q. Was it your intent that it would go to Brad and Gordia?**

**A. No, it was just intention to go to Brad.**

(*Id.* at 50).

\* \* \*

**Q. And when you had that intent that the benefit was to go to Brad you knew that Brad and Gordia were married?**

**A. Yes.**

(*Id.* at 51).

{¶23} Based on Iola's testimony given at the deposition, there was evidence to support Iola's donative intent. Iola testified that she thought the farm was worth $250,000 in 1993 when it was transferred for what she owed on the property-- $122,000. Iola testified that it was her intent that any excess equity be a "gift" to her son Brad.

{¶24} Although Iola also testified that she did not personally have an appraisal done of the property before it was transferred, Iola testified that to the best of her recollection, her valuation of the property was based on where Brad got

his loan. William Eirich testified at the final hearing that he did an appraisal of the farm for Ag Credit in 1993 when the farm would have been transferred to Brad and Gordia from Iola. (Oct. 12, 2010, Tr. at 7-12). Eirich testified that his 1993 appraisal valued the farm at $220,000--$160,000 for land and $60,000 for the residence and buildings. (Oct. 12, 2010, Tr. at 12).

**{¶25}** In the trial court's entry dated December 29, 2011, the trial court used this amount of $220,000 for the value of the property in 1993, and found that Iola had bestowed a gift to Brad of $98,000—the difference between what Brad and Gordia paid for the property ($122,000) and its value at the time of transfer ($220,000). The mere fact that the property was apparently not worth quite as much as Iola thought it was when she specifically desired to give a "gift" to Brad, does not change the nature of the transaction, or the intent of Iola. Therefore, we find that there was clear and convincing evidence upon which the trial court could rely to establish a gift in these circumstances from Iola to Brad in the amount of $98,000.[7]

**{¶26}** Making this finding, we acknowledge that any "gift" from Iola to Brad would not have been "pre-marital" as the trial court described it, thus creating an improper characterization by the trial court. However, we note that

---

[7] As previously mentioned, we acknowledge that the trial court did not expressly state the "clear and convincing" evidence standard that applies to gifts in its entry finding that a gift had been made. However, notwithstanding the trial court's omission, we find based on the excerpted testimony and the other evidence described herein that there was clear and convincing evidence in the record to support the trial court's decision. As a result, we find no prejudicial error herein.

perhaps the trial court's characterization of a "pre-marital gift" was some attempt to recognize or "compensate" Brad for an "earned" pre-marital equity in the farm on Brad's behalf. Brad had moved onto the farm essentially right after the farm was purchased and farmed the land with his father. According to testimony, while Brad was living on the farm he not only farmed the land but also made "substantial improvements" and the value of the land increased. (Sept. 29, 2010, Tr. at 50). Thus while the trial court's characterization of a "pre-marital gift" was inaccurate, the trial court heard sufficient testimony to determine first that there was a gift, and second that Brad acquired some pre-marital equity in the farm separate and distinct of the marital property.

{¶27} For all of the foregoing reasons, Gordia's first assignment of error is overruled.

*Second Assignment of Error*

{¶28} In Gordia's second assignment of error, she argues that the trial court erred in designating Brad as the residential parent of Mikayla and Brock. Specifically, Gordia argues that she is the parent more likely to facilitate court-approved parenting time, that the evidence "establishes" that separation would not be in the best interests of the children, that Gordia was the children's primary caregiver, that Brad's domestic violence conviction should weigh more heavily

against him, and that the court's decision was against the manifest weight of the evidence.

{¶29} An appellate court reviews a trial court's decision on child custody matters for an abuse of discretion. *Miller v. Miller*, 37 Ohio St.3d 71 (1988); *Erwin v. Erwin*, 3d Dist. No. 14-05-45, 2006-Ohio-2661, ¶ 12; *Swain v. Swain*, 4th Dist. No. 04CA726, 2005-Ohio-65, ¶ 16. An abuse of discretion implies that the court's attitude in reaching its judgment was unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). Due to the difficult and complicated nature of custody determinations, appellate courts must grant wide latitude to a trial court's consideration of the evidence, and, thus, we will not reverse a child custody decision that is supported by a substantial amount of competent, credible evidence. *Davis v. Flickinger*, 77 Ohio St.3d 415, 418 (1997); *Bechtol v. Bechtol*, 49 Ohio St.3d 21 (1990), syllabus.

{¶30} In making an allocation of parenting rights, the court must consider the best interests of the children. R.C. 3109.04(B)(1). In order to determine the children's best interests, the trial court is required to consider the factors outlined in R.C. 3109.04(F)(1), but may consider other additional factors as well. R.C. 3109.04(F)(1). Accordingly, we must examine the record to determine (1) that the trial court considered all of the necessary factors listed in R.C. 3109.04(F)(1) and (2) that there is competent, credible evidence supporting the trial court's

conclusion that designating Brad the residential parent and legal custodian of Brock and Mikayla is in the children's best interests.

{¶31} R.C. 3109.04(F)(1) directs the trial court to analyze the following factors when looking to the best interest of the children:

**(a)   The wishes of the child's parents regarding the child's care;**

**(b)   If the court has interviewed the child in chambers * * * regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;**

**(c)   The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;**

**(d)   The child's adjustment to the child's home, school, and community;**

**(e)   The mental and physical health of all persons involved in the situation;**

**(f)   The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;**

**(g)   Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;**

**(h)   Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been**

**determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code \* \* \*; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;**

**(i)    Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;**

**(j)    Whether either parent has established a residence, or is planning to establish a residence, outside this state.**

{¶32} Regarding custody of the parties' children, the trial court's entry reads as follows:

**Effective January 1, 2012, Plaintiff Bradley S. Williams shall be the residential parent and legal custodian of Mikayla Williams and Brock Williams, and Defendant Gordia L. Williams shall be the non-residential parent; and Defendant Gordia L. Williams shall be the residential parent and legal custodian of Matthew Williams, and Plaintiff Bradley S. Williams shall be the non-residential parent.**

(Doc. 222).

{¶33} The trial court expounded upon this holding in its "Findings of Fact and Conclusions of Law," stating the following:

-20-

**This finding is based upon considerations of all proper and required factors, including, but not limited to the wishes of each of the parents, the interactions of each child with their parents, siblings, and other significant persons, the adjustment of each child to their home, school and community, the mental and physical health of all persons involved, and considerations of which parent is more likely to honor and facilitate court-approved parenting time.**

(Doc. 230).

{¶34} Further, the court added:

**The Court conducted an *in camera* interview with the minor child, Mikayla, on March 15, 2011. The Court finds that Mikayla has sufficient reasoning ability to express her wishes and concerns with respect to parenting allocation. The Court further finds there are no special circumstances that exist which indicate it would not be in the best interests of Mikayla to determine her wishes. The Court finds that it is the wish of Mikayla to remain in the Republic, Ohio area.**

(Doc. 230).

{¶35} The following testimony was presented to the trial court pertaining to the factors in R.C. 3109.04(F)(1):

{¶36} With regard to factor (a) the trial court heard testimony that both parents wanted custody of the children.

{¶37} With regard to factor (b), the trial court interviewed Mikayla *in camera* and found her of sufficient reasoning ability to make her own decision regarding custody. (Doc. 230). Mikayla expressed her desire to stay in Republic and live with her father. (*Id.*)

{¶38} With regard to factor (c), the trial court heard testimony that Brad had a troubled relationship with Matt and that Gordia had a troubled relationship with Mikayla. (Aug. 25, 2010, Tr. at 301); (Oct. 10, 2010 Tr. at 89). There was also testimony presented that Mikayla and Matt occasionally had difficulty interacting, and that Matt had at one point taken on a disciplinary role with Mikayla. (Oct. 10, 2010 Tr. at 110); (Aug. 25, 2010, Tr. at 311, 337).

{¶39} With regard to factor (d), the trial court was aware of Mikayla's wishes to stay in the Republic area, but little-to-no testimony was presented with regard to any change in location for either of the parents that would affect the children. (Doc. 230).

{¶40} With regard to factor (e), both the parties and all three children had been to counseling during the pendency of this divorce. Testimony was presented that Matt and Brad were making progress and Mikalya and Gordia were making progress in their relationship.

{¶41} With regard to factor (f), the court heard testimony that each party had denied the other party time with the children. However, testimony was presented that for an entire summer Gordia denied Brad parenting time with Matt. (Aug. 25, 2010, Tr. at 352).

{¶42} With regard to factor (h), there have been no convictions for abuse or neglect. But on appeal, Gordia specifically points to Brad's conviction for

domestic violence as indicative as a reason why he should not be the residential parent of Brock and Mikayla.

{¶43} Upon reviewing the record, we find that factors (g), (i), and (j) are not relevant to this case.

{¶44} The trial court heard testimony weighing both for and against each parent being the legal custodian and residential parent of the children. While some of the factors may have weighed against Brad, we cannot say that the trial court abused its discretion in weighing the evidence overall in his favor. This is especially true considering Mikayla expressed her desire to live with her father, that Mikayla had a rocky relationship with her mother, that Mikayla occasionally had a rocky relationship with Matt, and that Gordia had denied Brad visitation rights with Matt for an entire summer. Gordia's own argument on appeal that the children should not be split weighs against her when considering Mikayla's wishes. At the release of this opinion, Matt will already be 18 so the only two remaining children will, in fact, be together. Moreover, while Gordia claims that the record "clearly establishes" that separation of the children was not in the best interests of the children, she cites no testimony supporting this claim. There is no evidence supporting this contention cited at all, let alone enough evidence to show that it was in any way "clearly" established.

{¶45} Based on the foregoing, we cannot say that the trial court's decision was against the manifest weight of the evidence or that the trial court abused its discretion in designating Brad as residential parent of Mikayla and Brock. Accordingly, Gordia's second assignment of error is overruled.

*Third Assignment of Error*

{¶46} In Gordia's third assignment of error, she argues that the trial court erred in finding her "voluntarily under-employed" and imputing income to her in the amount of $33,280.57.

{¶47} Whether a party is "voluntarily unemployed or under-employed" is a factual determination to be made by the trial court based on the circumstances of each particular case. *Rock v. Cabral*, 67 Ohio St.3d 108, 112 (1993); *Lam v. Lam*, 5th Dist. No. 2012CA00041, 2012-Ohio-4885, ¶ 25. Similarly, the amount of income imputed to a person found to be "voluntarily under-employed" is equally a question of fact, not to be disturbed, absent an abuse of discretion. *Id.*

{¶48} In its entry regarding this matter, the trial court stated the following:

> **Defendant voluntarily quit her employment as a nurse. Defendant is voluntarily under-employed. Therefore, her prior nursing income in the amount of $33,280.57 was used to calculate child support.**

(Doc. 222).

{¶49} In its findings of fact and conclusions of law, the trial court added

-24-

> **[Gordia] resigned her employment as a nurse after the filing of this action, and \* \* \* [t]he Court is imputing that income to her in calculating child support, as she is voluntarily under-employed.**

(Doc. 230).

{¶50} It is undisputed that Gordia holds a LPN and worked as a nurse making $16.59 an hour at the inception of this case. (Doc. 13). It is further undisputed that following the parties' split and the filing for divorce by Brad, Gordia voluntarily quit her employment at Bethesda Nursing Home. (Doc. 13). According to Gordia's own financial report, before quitting her job she made approximately $33,280.57 annually, the exact amount of income imputed to her by the trial court, and she had health benefits for the children. (Doc. 13).

{¶51} At the time of the final hearing in this case, Gordia testified that she was employed making $9.05 an hour. (May 2, 2011 Tr. at 19). While Gordia argues that there was no testimony showing that she could have been making $16.59 per hour, and thus she could not be "voluntarily under-employed," Gordia admittedly quit a job making that amount of money after this case began, a job which also supplied her and her children with health benefits. Based upon the facts in the record, we cannot find that the trial court abused its discretion by determining Gordia to be "voluntarily underemployed." Accordingly, Gordia's third assignment of error is overruled.

*Fourth Assignment of Error*

**{¶52}** In Gordia's fourth assignment of error, she argues that the trial court erred in its division of the children's tax dependency exemptions. Specifically, Gordia argues that the trial court should have awarded her the dependency exemptions for the two youngest children as she was imputed a higher income than Brad.

**{¶53}** "Under the federal tax code, the custodial parent is presumptively entitled to claim the child as a dependent." *Boose v. Lodge*, 3d Dist. No. 06-03-04, 2003-Ohio-4257, ¶ 5 citing *Barlow v. Ray*, 3d Dist. No. 9-96-68, (May 2, 1997). This presumption may be rebutted but the party applying for relief should "bear the burden of production." *Boose*, *supra*, at ¶ 7. "[T]he allocation of tax exemptions is a matter resting within the sound discretion of the trial court and, therefore, will not be overruled absent an abuse of discretion." *Id*. at ¶ 4 citing *Barlow*, *supra*.

**{¶54}** On this matter, the trial court's entry reads:

**Plaintiff shall have the right to claim Mikayla Williams and Brock Williams as dependents for tax purposes every calendar year. When Matthew Williams reaches an age such that he can no longer be claimed as a dependent for tax purposes, Defendant shall have the right to claim Mikayla as a dependent, and Plaintiff shall have the right to claim Brock as a dependent.**

(Doc. 222).

**{¶54}** On appeal, Gordia argues that because she was imputed a higher income than Brad, she should be entitled to the tax exemptions for Brock and Mikayla. The record establishes that Gordia was imputed an income of $33,280.57. Brad was imputed an income of $15,392. While Gordia argues that Brad was imputed a lower income, Brad showed an income of over $25,000 on his 2010 tax return; however, Brad had a carry-forward loss from 2009 which offset his 2010 income and left him with a negative overall income. (Def.'s Ex. BBB). Thus the trial court chose to impute Brad an income of $15,392 for the purposes of computation of child support, which amounts to minimum wage ($7.40—at the time—x 2080 hours).

**{¶55}** Although Gordia argues it would be in the best interests of the children that she receive the dependency exemptions, Gordia has in no way established that Brad would not be able to use the exemptions in the future. She has produced no documentation or financial figures showing that the children would benefit more with her receiving the dependency exemptions. Moreover, once Matt is no longer able to be claimed as a dependent, the court allowed Gordia to claim Mikayla for tax purposes, thus giving each parent one child for tax purposes.

{¶56} Based on the record before us, we cannot find that the trial court abused its discretion in awarding Brad the dependency exemptions for Mikayla and Brock. Accordingly, Gordia's fourth assignment of error is overruled.

*Fifth Assignment of Error*

{¶57} In Gordia's fifth assignment of error she argues that the trial court erred in failing to order Brad to pay her the sum of $3,000, representing the proceeds of an insurance check that was issued as a result of the loss or theft of Gordia's wedding ring.

{¶58} It is not disputed in this case that Gordia was issued an insurance check in the amount of $3,000 for her lost or stolen wedding ring. It is also not disputed that Brad received that insurance check. Brad testified that he deposited the insurance check and used the proceeds to pay down marital debt.

{¶59} According to Brad, around the same time he received the check from the insurance company for the ring, Brad was waiting on an insurance check for wind damage to one of the buildings on the farm. Brad later received this check for the wind damage in the amount of $3,578.29.

{¶60} Thus there were two separate checks received by Brad from insurance, one for the ring ($3,000), and one for the wind damage ($3,578.29). Throughout the proceedings, Gordia, through counsel, made repeated demands for

the distribution of what she argued was her separate property—the insurance proceeds from the ring.

**{¶61}** In the trial court's Final Entry, the following passage contains the only reference by the trial court to an insurance check:

> **The Court finds that the check in the amount of $3,578.29 from Ohio Mutual Insurance Group was applied to real estate loans for the joint benefit of both parties, and is not subject to further distribution.**

(Doc. 222).

**{¶62}** From this passage, it would appear that the trial court addressed *only* the check for the wind damage in its entry, not specifically mentioning the insurance check for the ring. However, the trial court did include another provision in its judgment entry that is applicable here.

> **All other pending requests for compensation between the parties due to alleged misconduct or other misappropriation of funds, including, but not limited to those listed within Plaintiff's Response to Notice of Submission of Asset (sic) Still Subject to Distribution by the Court, filed on November 8, 2011, are hereby DENIED. Each party has misused funds and behaved inappropriately throughout the pendency of this action. Neither party is entitled to further compensation from the other; neither party shall be awarded for their conduct in this action.**

(Doc. 222).

**{¶63}** Prior to the final hearing, each party had filed a "Notice of Assets Still Subject to Distribution by the Court." (Docs. 205, 213). In these two documents, each party accused the other of not distributing proceeds from various

-29-

checks received throughout the pendency of this divorce.[8] (Docs. 205, 213). In addition, throughout this divorce, both parties had filed multiple contempt motions, at least one of which against Gordia was sustained. (Doc. 145). With the facts of this case in mind, we cannot say that the trial court abused its discretion in summarily overruling all claims for misappropriated funds, including the funds for the ring, as there were multiple claims for misappropriated funds by both parties; not merely a claim for the ring proceeds by Gordia.

{¶64} Furthermore, in *Warner v. Warner*, 3d Dist. No. 14-3-10, 2003-Ohio-5132, this Court held,

> **[e]ven though the tennis bracelet and wedding ring were pre-marital property and would ordinarily be considered separate property by the court in distributing assets pursuant to a divorce, the insurance proceeds from the property is not necessarily separate property as well. We are not dealing with the actual jewelry in this case, but rather the insurance proceeds from the claim made to the insurance company for the lost or misplaced jewelry. In this case, the change in the state of the property from the actual jewelry to the insurance proceeds for the lost jewelry changes the classification of the property from separate to marital. The change in the classification of the property is due to the fact that the insurance on the jewelry was paid from marital funds, and prior to being paid from marital funds it was paid by Richard's parents, on a policy that included coverage for other marital assets. Since marital funds insured the jewelry, any claim made for the lost jewelry must be considered marital property as well.**

---

[8] There was a "Notice of Submission of Asset Still Subject to Distribution by the Court" filed by Gordia on November 1, 2011. This Notice listed the OMIG check for wind damage to the farm in the amount of $3,578.29. (Doc. 205). The notice did not list the insurance check for the ring. Brad also filed a similar "Notice" requesting the distribution of, *inter alia*, checks received by Gordia for the parties' sale of meat. (Doc. 213). Brad also sought to have the court enforce an order requiring Gordia to pay money back that she took from the children's bank accounts during the pendency of this action. (Doc. 213).

*Warner*, 2003-Ohio-5132, at ¶ 28. Thus, even if the ring itself was the separate property of Gordia, the insurance proceeds could be marital property and would have been properly applied to the parties' marital debt and not further subject to distribution. For all of the foregoing reasons, Gordia's fifth assignment of error is overruled.

*Sixth Assignment of Error*

{¶65} In Gordia's sixth assignment of error, she argues that the trial court failed to properly address all issues in its "Findings of Fact and Conclusions of Law." Specifically, Gordia claims that the trial court "repeated" what it had already held in its original judgment entry regarding "taxes," and that the trial court failed to deal with the check for the ring at issue in assignment of error number five.

{¶66} The Civil Rule governing this matter is Civil Rule 52, which reads, in part, as follows:

> **When questions of fact are tried by the court without a jury, judgment may be general for the prevailing party unless one of the parties in writing requests otherwise before the entry of judgment pursuant to Civ. R. 58, or not later than seven days after the party filing the request has been given notice of the court's announcement of its decision, whichever is later, in which case, the court shall state in writing the conclusions of fact found separately from the conclusions of law.**
>
> **When a request for findings of fact and conclusions of law is made, the court, in its discretion, may require any or all of the**

**parties to submit proposed findings of fact and conclusions of law; however, only those findings of fact and conclusions of law made by the court shall form part of the record.**

{¶67} The statute related to the issuance of findings of fact and conclusions of law in this case is R.C. 3105.171(G), which reads

**(G)  In any order for the division or disbursement of property or a distributive award made pursuant to this section, the court shall make written findings of fact that support the determination that the marital property has been equitably divided and shall specify the dates it used in determining the meaning of "during the marriage."**

{¶68} In this case, the trial court issued its decision on December 29, 2011. After a motion by Gordia to issue findings of fact and conclusions of law, the court requested proposed findings by each party.  (Doc. 224).  Both parties submitted proposed findings.  (Docs. 228, 229).  Subsequently the court issued findings of fact and conclusions of law.  (Doc. 230).  The findings added to the original Entry, *inter alia*, detail to the distribution of the farm, and further reasoning to support the custody and child support decision.  *Compare* (Doc. 222) *with* (Doc. 230).

{¶69} The mere fact that further findings were not made to support decisions Gordia found adverse to her position does not make the trial court's findings of fact and conclusions of law inadequate.  The trial court sufficiently supported its reasoning either in the original judgment entry or the later filed

"findings," enabling this Court to conduct a meaningful review. Accordingly, Gordia's sixth assignment of error is overruled.

{¶70} For the foregoing reasons, Gordia's assignments of error are overruled and the judgment of the Seneca County Common Pleas Court is affirmed.

*Judgment Affirmed*

**PRESTON and WILLAMOWSKI, J.J., concur.**

**/jlr**